## GEORGE ALLEN, APPELLANT, *v.* EDWARD HIRSCH, STATE TREASURER, RESPONDENT.

CONSTITUTIONAL ACT—WAGON ROAD ACT NOT LOCAL OR SPECIAL.—The acts entitled "An Act to provide for the construction of a road in Grant and Baker counties, to be known as the Eastern Oregon and Winnemucca Road," approved October 19, 1872, and "An Act to provide for the construction of a wagon road up the south bank of the Columbia river from near the mouth of Sandy, in Multnomah county, to the Dalles in Wasco county," approved October 23, 1872, are not in conflict with article 4, sec. 23, subd. 7, of the constitution, which declares that "the legislative assembly shall not pass special or local laws in any of the following enumerated cases, that is to say, * * * for laying, opening, and working on highways, and for the election or appointment of supervisors." The said acts of the legislative assembly are public laws, and not special or local laws, within the meaning of that clause in the constitution.

APPEAL from Marion County.

The case is mandamus to compel the payment of certain warrants drawn by the secretary of state upon the state treasury. The appellant filed in the circuit court his petition for a writ of mandamus, in which he referred to the acts of the legislative assembly of October 23, 1872, and October 21, 1876, providing for the issuing of warrants on account of the road commonly known as "The Dalles and Sandy Wagon Road, and to the act of October 19, 1872, providing for issuing warrants on account of the "Eastern Oregon and Winnemucca Road;" and recites so much of each of said acts as relates to the appropriation of moneys to meet the warrants, the funds out of which such warrants should be payable, and the proceedings necessary to authorize the secretary of state to draw the warrants. The petition then states particularly and at length such facts as show that on the twenty-fourth day of May, 1875, a warrant was drawn in accordance with the provisions of said act of October 23, 1872, by the secretary of state, for one thousand dollars, payable to the order of the chairman of the board of commissioners created by said last named act, out of the funds applicable thereto under said act; that on said twenty-fourth day of May, 1875, said warrant was presented to the state treasurer for payment, but was not paid for want of

funds in the hands of the treasurer applicable thereto; that since that time, and prior to the twenty-seventh day of August, 1879, the said warrant had been indorsed by the said chairman of the board of commissioners, and the petitioner had become the holder thereof; that before said twenty-seventh day of August, 1879, sufficient moneys belonging to said funds had been received into the state treasury to pay said warrant; and that on that day the petitioner presented said warrant to the defendant, who then was and still is state treasurer, and demanded payment thereof, but payment was refused. This is the first count of the petition.

The petition then proceeds, with the same particularity, to set forth the drawing of a warrant by the secretary of state, on the thirteenth day of September, 1877, in accordance with said act of October 21, 1876, for one thousand dollars; the presentation of that warrant to the state treasurer on the day it was drawn; its non-payment for want of applicable funds; the subsequent transfer of the warrant to the petitioner; the receipt into the treasury of funds sufficient to pay it; the presentation and demand of payment on the twenty-seventh day of August, 1879; and the refusal of defendant, as treasurer, to pay it.

In the same manner the petition states the drawing of a warrant, by the secretary of state, on the fifteenth day of May, 1873, upon the treasury, in accordance with the said act of October 19, 1872, for one thousand nine hundred and ninety-six dollars; its presentation to the treasurer on the day it was drawn, and its non-payment for want of applicable funds; its subsequent transfer to the petitioner; that there was on the thirty-first day of October, 1879, sufficient funds in the treasury applicable to its payment; and that on that day it was presented by petitioner to the defendant as treasurer, and payment was demanded and refused.

Upon these allegations the petitioner prayed writ of mandamus to compel the defendant, as treasurer, to pay said several warrants, and the accrued interest thereon. The alternative writ was issued, commanding the defendant to pay the warrants, or show cause why he had not done so. On the return day, the defendant demurred to the petition,

on the ground of insufficiency; and the circuit judge, without argument, and upon the understanding that the case was to go to the supreme court to test the constitutionality of the several acts of the legislative assembly, under which the warrants were drawn, made a *pro forma* decision sustaining the demurrer and dismissing the cause at petitioner's cost. The petitioner appeals to this court.

*W. Lair Hill*, for appellant:

Subdivision 7 of section 23 of article 4 of the constitution of the state provides as follows: "The legislative assembly shall not pass special or local laws in any of the following enumerated cases, viz: * * * For laying, opening, and working on highways, and for the election or appointment of supervisors." It is contended that the several acts referred to in the petition are special or local laws, and by reason of their subject-matter are prohibited by the constitutional provision just quoted; and that therefore the warrants drawn under those acts are void. On the surface of the case it is seen, that in order to reach a decision as to the right of the petitioner to the relief demanded, the court must consider and pass upon the questions:

1. Are the acts in question special or local laws within the meaning of the constitution?

2. If these acts are special or local laws, are the warrants drawn in pursuance of them void?

Are the acts in question special or local laws within the meaning of the constitution? This is primarily a question of definitions. It must first be ascertained what is a special or local law; in other words, what are the definitions of the terms special and local, as used in the constitution; and then it must be determined by examination of the acts in question, whether they fall within either of these definitions. It will hardly be contended that these acts fall within the definition of local laws, as there can hardly be any difference of opinion among lawyers upon that subject. If, however, it should be contended on the part of the respondent, that they are local laws, the error of that position will be per- ·

ceived upon a moment's consideration of the matter. A local law is a law which affects only the inhabitants of a particular district. It is operative generally within certain geographical boundaries, but inoperative outside of those boundaries. It is general in character, but local in its application. (1 Bl. Com. 74; Bouv. Dict., *in verb.* "Custom;" *People* v. *Supervisors of Chautauqua,* 43 N. Y. 10.) Neither of the three acts under which these warrants were drawn comes within this definition. In *People* v. *Supervisors,* just cited, the fact that the money to be raised was to be used in paying for a local public work, was held not to make the law local, and that is the only feature of the acts now under examination which even suggests the idea of their being local laws.

Are these acts special laws within the meaning of the constitution? The answer to this question depends on the question, What is a special law, as the term is employed in the constitution? And unless, by the constitution itself, or by the historical circumstances under which it was adopted, it is apparent that the word special, as applied to a law, was intended by the framers of that instrument to have a meaning different from its technical or common law meaning, that technical or common law definition must be taken as the true meaning in the constitution. This is a settled canon of constitutional interpretation. (Cooley on Const. Lim. 59–61.) Applying this rule of interpretation, what is meant by "special law" in the constitution? It had, and still has, a well-known common law meaning. When applied to statutes, the word special is a technical word, and is synonomous with "private," which was formerly the more frequent term. A special or private statute is a statute which affects only certain specified individuals or private concerns. It is the opposite of a public or general law, which applies to all persons who may happen to be so situated as to fall within the general purview of operation. (1 Bl. Com. 85; Bouv. Dict., *in verb.* "Statute;" *Calking* v. *Baldwin,* 4 Wend. 668.) Examine the acts in question, bearing in mind this common law definition of a special law. The act of October 23, 1872, condensed into

a few words, was simply this: It created a commission to survey, and lay out, and construct a public road from the Sandy river, in Multnomah county, to Dalles City, in Wasco county; appropriated for the construction of the road, fifty thousand dollars out of the funds arising from the five per centum of the sales of public lands, and out of the funds arising from the sale of swamp and overflowed lands; and prescribed in detail the duties of the commissioners in carrying on the work. That is the act under which the first of the warrants described in the petition was drawn.

The act of October 21, 1876, under which was drawn the second of the warrants described in the petition, is merely an act changing, in some respects, the plan of carrying forward the work provided for by the former act, and making a further appropriation for that purpose. The act of October 19, 1872, under which was drawn the third of the warrants described in the petition, is in all respects, so far as concerns the question of whether it is a general or a special law, exactly similar to that of October 23, 1872. Neither of these confers any rights or privileges upon particular individuals. They are acts for a public purpose, namely, the making of certain public internal improvements. Their object is to promote and facilitate public travel and transportation, and their method is that which is necessarily adopted in the execution of all public works, that is, by the employment of public agents. They in no wise differ in this respect from the acts creating commissions to build the state house, to protect the rights of the state and people in the canal at Oregon City—to perform services in connection with any public improvement. Whatever may be the title conferred on the agent by the statute, the principle on which his relations to the public are to be determined is always the same. Such laws, it is plain, do not answer the common law description of special or private statutes. This proposition, so plain to reason, is equally supported by authority. (*Calking* v. *Baldwin, ubi sup.*) An almost unlimited array of decisions to the same effect might be cited, and none, it is believed, can be produced, holding the contrary.

These acts being shown to be neither special nor local, as those terms were defined by the common law, they are not such laws as the constitutional provision was intended to prohibit, unless it appears from the constitution itself, or from its historical surroundings, that the convention by whom the constitution was framed, were induced to employ the well-known terms of law in a sense different from their well-known legal meaning. No other deliberative body that ever sat in Oregon had among its members so many distinguished lawyers, as had that convention. In its roll of membership appear the names of no less than seven who have been supreme judges, including all the judges of the supreme court at this time. It was presided over by one whose reputation as a jurist is coextensive with the nation. Another of its members has since been attorney-general of the United States. And besides these, there were many lawyers whose achievements at the bar form a part of the · public history of the country. One does not readily conclude that a convention controlled by men of such character, in framing an instrument which, by its nature, would be expected to be written in the peculiar language of the law, which was to be interpreted and administered by the courts of law, and which was to control all future legislation of the state, would employ the technical terms peculiar to their art and profession, in a sense different from their technical and legal sense, and then furnish no key or clue by which their intended sense could be discovered. But highly improbable as such a conclusion would be, it must be adopted before the court can hold these acts to be either special or local within the meaning of the constitution. If the views above expressed are correct, they dispose of the case by establishing the validity of the warrants in question.

But suppose the acts under which the warrants were drawn should be held to be special laws, so far as they provide for the laying, opening, and working the roads therein specified, does it follow that the warrants are void? I submit that it does not. Under these acts the warrants were drawn and went into circulation. The state, by its agents, received the money for them and used it in the internal improvements

provided for in the acts. Can the state now, after having gotten and used the consideration for which the warrants were issued, repudiate the debt and protect itself in so doing by pleading that the law made by itself and through which it was enabled to obtain the money and carry on its public works, is void? Certainly in morals it is estopped to do so, and it ought to be estopped in law. It seems to me this case is analogous, in respect of the point now under consideration, to that of one arising under a contract which is void for non-compliance with mere statutory requirements in its execution. So long as the contract remains wholly executory, either contracting party may repudiate it; but when one has performed it on his part, the other, having received the benefit of it, must make him whole. It will not be disputed that if one, having received value upon a void contract, gives his note or bill for the payment, it is too late for him to question in a court the validity of the transaction.

If to this the answer be made that the principle on which the argument is founded applies only to · cases of contracts which are void by reason of some defect in the mode of their formation, and not to those which are absolutely unlawful, I reply that while at first presentation there appears to be some force in the suggestion, it will not bear the test of logical scrutiny. Under the constitution, statutes may be passed providing for laying, opening, and working highways, and the defect alleged against the acts in question is not that they are upon subjects on which the legislature was prohibited from legislating, but that the legislature did not proceed in such a manner as to make the acts valid. The defect complained of is a defect of manner or mode simply, and the consequence contended for is not such as usually follows, as the penalty of violated law, but simply that the acts are invalid. So the analogy to the case suggested, a case under the statute of frauds, for example, is perfect. And by following this analogy the administration of justice is kept in the line of natural equity and good conscience, while by disregarding it, natural justice is trodden down, the state becomes a repudiator of its honestly-contracted obligations, and in the end suffers ten-fold more in the loss

of its credit than it can possibly gain from the ill-gotten exemption from its debts.

There is another point that deserves consideration as bearing on the question of the validity of the acts authorizing the first and second warrants described in the petition. These acts provide that the warrants shall be payable out of the funds arising from the five per centum of the net proceeds of sales by congress of public lands in the state, as well as out of the funds arising from the sale of swamp and overflowed lands. In the constitution (article 8, sec. 2), provision was made for diverting this fund to the fund for public education. But congress, in the act admitting the state into the Union, submitted six propositions to the "people of Oregon," each of which, if effectual, would modify, extend, or limit the constitution in some particular. One of these propositions was, that the five per centum fund above referred to should be "paid to the said state for the purpose of making public roads and internal improvements, as the legislature shall direct." And this proposition, as well as the others, was by the same act of congress made to depend on the express condition that the people of Oregon should "provide by ordinance, irrevocable without the consent of the United States," that the state should never interfere with the primary disposal of the soil, etc. The people of Oregon, by their legislature, thereupon, formally and solemnly, accepted all the propositions and passed the required ordinance, declaring it to be irrevocable without the consent of the United States. That was the last of the series of instruments, of which the constitution was the first, by which Oregon reached her present position in the Union; and I humbly submit that the proposition above cited has the effect so far to modify the constitutional provision upon which respondent relies, as to except from its operation such acts as apply the five per centum fund to the building of public roads. The proposition is not only that the fund shall be used in accordance with the original intention of congress as expressed in the act of 1841, but that it shall be applied to that object in such manner "as the legislature may direct." If this has

any force at all, it repeals, by unavoidable implication, the restrictions upon the legislative authority to pass special laws for the application of this fund to the construction of public roads.

Thus matters stood till 1871, when congress, by joint resolution, gave the consent of the United States for this fund to be transferred to the school fund; but in the same resolution it was expressly provided that nothing therein contained should "influence the construction" of the act, in which the six propositions were made. This proviso, I take it, makes the resolution of 1871 ineffectual until the state of Oregon shall revoke its acceptance of the proposition. The acceptance of the proposition was an enactment of its provisions, and the resolution of congress did not repeal that enactment; it merely absolved the state of Oregon from its obligation not to revoke it.

If I am correct in insisting that these acts are neither *special* nor *local* laws, it follows that all the warrants are valid. If I am wrong on this point, but right on the proposition that the state can not refuse to pay its warrants after it has received the consideration for them, it follows that all the warrants are valid. If I am wrong on both the above points, but right as to the effect of the act of congress admitting the state into the Union, and of the acceptance by the state of the propositions therein contained, it follows that the first two warrants described in the petition are valid.

*Knight and Lord*, for respondent:

The petition of appellant as to the first and second causes of action is fatally defective in this: There is no allegation in either of said causes that there was at the time the payment of said warrants was demanded of respondent, money in the state treasury sufficient to pay the same and applicable thereto. The allegation upon that point in the first cause of action is as follows: "Thereafter (the date of the first presentment of the warrant to the state treasurer), and prior to the twenty-seventh day of August, 1879" (the day payment was demanded of respondent), "there was received

into the state treasury, of said funds, an amount of money sufficient to pay said warrant."

The allegation in the second cause of action is precisely the same as in the first. These allegations, we claim, are not sufficient to constitute a cause of action against the respondent, and that the demurrer was properly sustained as to those causes of action.

In the next place, we claim that the several laws under which all of the warrants mentioned in the petition were issued are special and local laws, and are, therefore, void under section 23, article 4, of the constitution of this state, which reads as follows: "The legislative assembly shall not pass special or local laws in any of the following cases," and among the enumerated cases under that section is the following: "7. For laying, opening, and working of highways, and for the election or appointment of supervisors." This section of the constitution carries with it its own interpretation; and it is too plain for argument that no road or highway can be laid out or worked in this state except under and pursuant to a general law providing for the location and construction of all roads in the state. In obedience to that provision of the constitution, the legislature has provided by general law for laying, opening, and working of all highways in this state. (Civ. Code, 721.) Each of these laws provides for the laying out and construction of a special and particular work, and they are, therefore, unconstitutional and void. It follows, therefore, as a legal consequence, that these warrants, issued under and pursuant to those laws, are also void, and their payment was rightly refused by the respondent.

By the Court, KELLY, C. J.:

The question here presented for consideration is, whether the several acts of the legislative assembly referred to in the appellant's petition authorizing the construction of the Dalles and Sandy road and the Eastern Oregon and Winnemucca wagon road are constitutional.

Article 4, section 23, subdivision 7, of the constitution is as follows: "The legislative assembly shall not pass

special or local laws in any of the following enumerated cases; that is to say * * * 7. For laying, opening, and working on highways, and for the election or appointment of supervisors." It is claimed by the counsel for respondent, that these acts are special and local in their character, and therefore in conflict with the provision of the constitution just quoted, and the warrants drawn under and in pursuance of them are, therefore, necessarily void. Blackstone says: "Statutes are either general or special, public or private. A general or public act is an universal rule that regards the whole community; and of this the courts of law are bound to take notice judicially and *ex officio*. Special or private acts are rather exceptions than rules, being those which only operate upon particular persons and private concerns." (1 Bl. Com. 85.) The words "general" and "public" are here used as expressing the same kind of statutes. So, also, special statutes are, according to the common law definition, synonymous with private statutes. The early elementary law writers seem to have made no distinction between a private and a local statute, but define private acts to be those which related to particular persons or classes of men, or which related to a particular place or town. (Burrill's Law Dict., *voce* "Private Statute;" Bac. Abr., Statute F; 1 Kent's Com. 459.) In more recent times, another distinction has been made by the constitutions of several states of the Union, including that of Oregon, in which the terms "local act" and "local laws" are used in contradistinction to public or private acts or laws. Notably this is so in the constitution of New York, and the decisions of the court of appeals have, in a measure, construed and settled the meaning of the words "local bills" or "local acts" in that state.

In the case of *The People* v. *Hills*, 35 N. Y. 449, it was held that "an act to amend and consolidate the several acts relating to the city of Rochester," was a local act, within the meaning of the constitutional provision "that no private or local bill which may be passed by the legislature shall embrace more than one subject, and that shall be expressed in the title." In *The People* v. *O'Brien*, 38 N. Y. 193, the

question before the court was whether an act of the legislature, so far as it related to the term of office and the time for electing councilmen in the city of New York, was a general or local law. The court said: "It is clear that it relates only to the officers of the municipal corporation of New York, and has no force outside of the territory embraced in the corporation, nor any possible effect upon property not within the corporate limits, or upon persons not for the time being within such limits. It would seem to follow necessarily that the act in question is local, as contradistinguished from general. The former is entirely confined in its operations to the property and persons of a specified locality, the latter embracing either persons or property of the people of the state generally, or some class of persons or species of property."

In *The People* v. *Allen*, 42 N. Y. 378, the question was whether an appropriation of money to improve Bouquet river was a general or local act. It was a small stream emptying into Lake Champlain, and navigable for boats about three miles from its mouth. Of it the court says: "Its name is not found upon the general maps of the state; it is not found in any general history of the country, and its character is in no way defined in any public statute; and it is not of such notoriety as to be known generally to the people of the state; and hence the courts can take no more notice of its character and existence than of the character, location, and usefulness of the ordinary highways of the state. In this respect it is unlike the great rivers and lakes of the state, and the mountain ranges, which are matters of general history and public notoriety." The court further says: "This is unlike any of the improvements of the Hudson river. That is a river navigable for about one hundred and fifty miles, forming a necessary link in the chain of water communication between the ocean and the great lakes. It acts an important part in the commerce of the whole state, and the citizens of the state generally are interested in its navigation. An improvement made in its navigation at any point would not be mainly or materially for the benefit of the people living at or near that point, but

would be for the benefit of the entire commerce of that great river, and of the commerce of the whole state." The statute was held by the court to be a local act, because of the insignificant character of Bouquet river, and because the improvement of it would be mainly for the benefit of the people living in the immediate locality. But the court clearly intimates that an act for the improvement of the Hudson river would not be a local but a general one, because it is the connecting link in the chain of water communication between the ocean and the inland lakes. The court of appeals, in the case of *The People* v. *Supervisors of Chautauqua*, 43 N. Y. 10, goes into a somewhat critical examination of the authorities defining what is a local and what a general act, but in its essential features it is substantially like the case last referred to.

The foregoing cases have been referred to, to show what are to be considered local acts or local laws. In contradistinction to these, all acts which relate to the location and construction of the public buildings of a state, to the establishment of new counties and prescribing their limits, are public acts, because in their very nature the people of the whole state have an interest in them. In the case of *The State ex rel. Cothren* v. *Lean*, 9 Wis. 279, the supreme court of Wisconsin say in relation to the establishment of the county seat of Iowa county: "At the county seat of each county, the state through its proper officers administers justice; all the inhabitants of the state are liable to be sued in any county and to have their rights litigated there. And we think there is much force in the reasoning of the late Chief Justice Stowe, in the Washington county seat case, where he contends that laws relating to the location of county seats are public acts; and this view is sustained by other authorities." The court in that case also says that it is undoubtedly difficult to draw an accurate line between general laws and those not general, and to establish a test that will be entirely satisfactory. But it was there held that the character of an act of the legislature, whether it be a "general" law or not, is determined by the greater or less extent to which it affects the people, rather than by the ex-

tent of territory over which it operates, and that a law operating in a single county, but affecting the rights of all the people therein, is a general law. In the case of *New Portland* v. *New Vineyard*, 4 Shep. 69, it was held by the supreme court of Maine that an act annexing one town to another was a public act. The court says: "Those are to be regarded as public acts which regulate the general interests of the state, or any of its divisions."

In the case of *West* v. *Blake*, 4 Blackf. 236, the supreme court of Indiana says "that an act authorizing an agent of the state to lay off and sell lots in a particular town, it being the seat of government, was a public act." And in reasoning upon the question it says: "Statutes incorporating counties, fixing their boundaries, establishing court-houses, canals, turnpikes, railroads, etc., for public uses, all operate upon local subjects. They are not, however, for that reason special or private acts." Other cases might be adduced to mark the distinction between public and special or local laws. The general principle to be deduced from all the authorities seems to be this, that whenever an act of the legislature authorizes any public road or other internal improvement to be made or other act to be done, which in its nature is more beneficial to the community at large than to the inhabitants in the immediate locality of the road, or other internal improvement, such act is to be considered a public and not a special or local law.

During the ten years of territorial government in Oregon, it was the constant practice of the legislative assembly to pass special laws to lay out territorial roads from one point to another, sometimes in the same county, but more frequently in two or more counties of the territory. Generally they were passed through the influence of interested parties, who were often named in the act as commissioners to locate the road, and the expenses of such location were imposed on the counties in which the roads were established. And then by the act of January 27, 1854 (Statutes of Oregon, 1854), the expense of opening and working them was imposed on the several road districts through which they passed. These burdens thus imposed on the people of special local-

ities were considered as onerous, and the whole system of laying, opening, and working territorial roads came to be regarded as an exceedingly vicious mode of legislation, which interfered with the regular road system of the territory. And it was to destroy and prevent that kind of legislation that the inhibition referred to was inserted in the constitution.

Referring to the Dalles and Sandy road, now partially constructed under these acts of the legislative assembly: It is well known to all that during the winter months it is the only practicable route for a public road through the mountain range which separates eastern from western Oregon, and it was deemed to be of the most importance to the people of the state that trade and travel and mail facilities should not be obstructed; that intercourse between these two great divisions of the state should not be suspended during that season of the year when navigation on the Columbia is genererally closed by ice in the river. It was well known to the legislative assembly that, for weeks at a time, all communication between the east and west was suspended, until the interruption came to be regarded as almost a public calamity, and it was to prevent these obstructions that the appropriations of money were made to construct the Dalles and Sandy road. It is in no sense a local road. The advantages to the inhabitants living along the route or line of the road are insignificant when compared with what will be the benefits to the people at large, or at least to those residing in the two great sections before referred to, whenever the road shall be completed.

The reasons given to show that the acts making appropriations to aid in the construction of the Dalles and Sandy road are not special or local laws, will equally apply to the act authorizing the construction of the eastern Oregon and Winnemucca wagon road.

It may be noted here that the moneys appropriated by these acts are not derived from taxes levied on the people of the state. The five per centum of the net proceeds of the sales of the public lands are paid by the United States to this state expressly for the purpose of making public roads and

internal improvements, and can be applied to no other purpose without a violation of the trust upon which they are received. The swamp and overflowed lands also were granted to the state for the purpose of paying the expenses of reclaiming them. And the fund in the treasury arising from the sale of these lands is the excess of the purchase money, over and above the expenses of the reclamation, which expenses the purchasers have either paid or are under obligation to pay hereafter.

There is another reason why the acts of the legislative assembly, referred to in the petition, are to be regarded as general laws, and not special or local acts. Article 4, section 27, of the constitution, declares that "every statute shall be considered a public law, unless otherwise declared in the statute itself." Neither of the acts contains such a declaration.

We hold, therefore, that they do not come within the constitutional inhibition contained in section 23 of article 4, that "the legislative assembly shall not pass special or local laws  *   *   *   *  for the purpose of laying, opening, and working on highways." We think the objection to the sufficiency of the first and second clauses of the petition is well taken by the counsel for respondent. In neither of them is there any allegation that when payment was demanded on the twenty-seventh day of August, 1879, there was sufficient money in the treasury to pay said warrants and applicable to such payment. The third clause in the petition is not open to this objection, and a peremptory writ of mandamus ought to be allowed, commanding the respondent to pay the warrant for one thousand nine hundred and ninety-six dollars, unless he shall ask leave to file an answer and defend upon the merits.

It is ordered that the judgment be reversed, and this cause remanded to the court below for further proceedings. And it is further ordered that the costs of this proceeding be paid by the state.

BOISE, J., dissents from this opinion, on the ground that the laws providing for these warrants are special laws within

the meaning of section 23, subdivision 7, article 4, of the constitution. Section 27 of said article does not abridge the force of section 23, for the reason that a special law may be also a public law, and the provisions of these different sections are not repugnant to each other. Smith on Construction defines a special law as distinguished from a general law. Of the latter he says: "It is one which provides for all things of a kind or genus; special provides for a species of the genus." In this case a general law relating to highways should provide for all the highways of the state; a special law to a particular highway, as in this case.