## CRAWFORD *v.* LINN COUNTY.

CONSTITUTIONAL LAW.—The provisions of an act approved October 26, 1882, known as the mortgage tax law, that " a mortgage, deed of trust, contract or other obligation, whereby land or real property situated in no more than one county in this state, is made security for the payment of a debt, together with such debt, shall, for the purposes of assessment and taxation, be deemed and treated as land or real property," and be taxed in the county where the land shall lie, are not in violation of article IX, § 1, nor article I, § 32 of the constitution of this state.

TAXATION.—LEGISLATIVE POWER.—The power of the legislature over the subject of taxation is limited only by the conditions that it shall be equal and uniform and shall extend alike to all property "excepting such only for municipal, literary, scientific, religious or charitable purposes as may be specially exempted by law. *Semble*, that this provision inhibits the exemption of choses in action.

EXEMPTION.—The statute above mentioned does not exempt mortgages on real property situated in more than one county, but leaves them subject to taxation under previously existing laws.

IDEM.—The power to tax is vested in the legislature, and the exercise of that power cannot be restrained by the courts upon considerations of policy, or supposed natural equity.

IDEM.—SITUS OF PERSONAL PROPERTY.—The legislature has power to fix the *situs* of a particular species of personal property for purposes of taxation. The provision as to equality of taxation is not affected by this power.

CONSTRUCTION OF LEGAL TERMS.—When a word which has a definite legal meaning is used in a law without defining it, it will be construed according to its accepted legal definition.

SPECIAL LAW—As used in article 4, § 23, constitution of Oregon, is synonymous with "private law."

PUBLIC LAW.—Whether a law be public or private is to be determined generally by the subject matter. A law is public when all persons placing themselves in the situation contemplated by it, must take notice of it at their peril.

APPEAL from Linn County.

*Chas. E. Wolverton*, for appellant.

*R. S. Strahan, and Bilyeu, and Burnett*, for respondent.

By the Court, WALDO, C. J.:

This case turns on the constitutionality of the act of the legislative assembly, approved October 26, 1882, known as the mortgage tax law. The act is alleged to be unconstitutional; first, because it does not provide for equal and uniform taxation, and second, because it is a special law.

In a case that came up before the United States circuit court for the district of Oregon in March, 1884, *Dundee*

*Mort. &c. Co.* v. *School District,* the act was considered open to both these objections and was accordingly declared unconstitutional and void. When the law was formerly before this court in *Mumford* v. *Sewell, ante* p. 67, these points were not presented by counsel, nor were they considered by the court. These questions have now to be examined.

The constitutional limitations on the powers of the legislative assembly over the subject of taxation, are found in sec. 1 of art. IX, and the last clause of sec. 32, art. I. Section 1, art. IX, consists of two clauses: First—"The legislative assembly shall provide by law for uniform and equal rate of assessment and taxation." Second—"And shall prescribe such regulations as shall secure a just valuation for taxation of all property, both real and personal, excepting such only for municipal, literary, scientific, religious or charitable purposes, as may be specially exempted by law."

These two clauses are limitations upon distinct powers, and must be construed independently of each other. In the first clause, the word "rate" is used in a somewhat different sense when applied to the assessment from that when applied to taxation. "The term rate may apply either to the per centage of taxation, or to the valuation of property:" (*State* v. *Utter,* 5 Vroom, 49.) It is applied in this clause in each sense—in the former sense to the taxation, and in the latter to the assessment. It is evident that equality in the rate of assessment means proportional valuation—relative, not absolute equality; while equality in the rate of taxation means that the per centage shall be the same, or absolutely equal. The result is relative equality of taxation. The first constitution of Tennessee furnished a remarkable

instance of absolute equality of taxation, resulting finally as the court say, in 1 Yerger, 487, in the grossest inequality. A provision required all lands to be "taxed equal and uniform in such manner that no one hundred acres shall be taxed higher than another."

If the rate of assessment and taxation be equal, it is conceived it will be uniform; that is, that no meaning can be attached to the word "uniform" which is not conveyed by the word "equal." If the rate is everywhere equal, or the same, it will be uniform necessarily. If the rate is varied so that property of different kinds or in different localities is valued or taxed at different rates, the rate will be unequal, and so not uniform; and so far as it is equal it will also be uniform.

Now, is the provision that the rate of assessment and taxation shall be equal, or equal and uniform, a limitation imposed by the constitution on power which the legislature would otherwise possess, and if so, what is the extent of that limitation? It will be convenient, in the first place, to see what the powers of the legislature are in the absence of express constitutional restrictions; for it is a precarious, it may be an impossible task, to define accurately the limitations of a power, unless the power itself be first ascertained.

It is ordained, sec. 1, art. IV, of the constitution of Oregon, that: "The legislative authority of the state shall be vested in the legislative assembly, which shall consist of a senate and a house of representatives." In *Sharpless v. Mayor of Philadelphia*, 21 Pa. St., 160, Black, C. J., discussing the taxing power of the commonwealth, said of the like provision in the constitution of Pennsylvania: "It is plain that the force of these general words, if there had

been nothing else to qualify them, would have given to the assembly an unlimited power to make all such laws as they might think proper. They would have had the whole omnipotence of the British parliament. But the absolute power of the people themselves had been previously limited by the federal constitution, and they could not bestow on the legislature authority which had already been given to congress. The judicial and executive powers were also lodged elsewhere, and the legislative department was forbidden to trench upon the others by an implication as clear as words could make it. The jurisdiction of the assembly was still further confined by that part of the constitution called the "declaration of rights," which in twenty-five sections carefully enumerates the reserved rights of the people, and closes by declaring that "everything in this article *is excepted out of the general powers* of the government and shall remain forever inviolate." The general assembly cannot, therefore, pass any law to conflict with the rightful authority of congress, nor perform a judicial or executive function, nor violate the popular privileges reserved by the declaration of rights, nor change the organic structure of the government, nor exercise any other power prohibited in the constitution. If it does any of these things, the judiciary claims, and in clear cases has always exercised, the right to declare all such acts void. But beyond this, there lies a vast field of power granted to the legislature by the general words of the constitution, and not reserved, prohibited or given away to others. Of this field, the general assembly is entitled to the full and uncontrolled possession. Their use of it can be limited only by their own discretion.

"There is nothing more easy than to imagine a thousand tyrannical things, which the legislature may do if its mem-

bers forget all their duties; disregard utterly the obligations which they owe to their constituents, and recklessly determine to trample on right and justice. But to take away the power from the legislature because they may abuse it, and give to the judges the right of controlling it, would not be advancing a single step, since the judges can be imagined to be as corrupt and wicked as legislators."

" The taxing power being a legislative duty, is, of course, entrusted to the general assembly, and it is given to them without any restriction whatever. They are to use it according to their discretion, and if they abuse it, and if public opinion is not just or enlightened enough to correct their errors, there is no remedy."

" So, in Connecticut, it is said that a law laying a tax is, in the absence of constitutional restrictions, peremptory and supreme. The legislature may well say, ' *Sic volo, sic jubeo, stet pro ratione voluntas.*' "

" So, in New York, in the great case of the *People* v. *Brooklyn*, 4 N. Y., 428, the court, referring to the decision in *People* v. *Brooklyn*, 6 Barb., 209, where it had been held that a tax to be valid must be apportioned upon principles of just equality and upon all the property in the same political district, and that this is a fundamental principle of free government, which, although not contained in the constitution, limits and controls the power of the legislature, say: " This is new and it seems to me to be dangerous doctrine. It clothes the judicial tribunals with the power of trying the validity of a tax by a test neither prescribed nor defined by the constitution. If by this test we may condemn an assessment apportioned according to the the relation between burden and benefit, we may, with a far better reason, condemn a capitation tax, on the ground that numer-

ical equality is not just equality; or a general property tax for a local object, because it compels one portion of the community to pay more than their just share for the benefit of another portion. All discriminations in the taxation of property, and all exemptions from taxation on the ground of public policy, would fall by the application of this test. If this doctrine prevails, it places the power of the courts above that of the legislature in a matter affecting not only the vital interests, but the very existence of the government. It assumes that the apportionment of taxation is to be regulated by judicial and not by legislative discretion. It obstructs the exercise of powers which belong to and are inherent in the legislative department, and restrains the action of that branch of the government in cases in which the constitution has left it free to act."

In *Lane County* v. *Oregon*, 7 Wall., 77, the court say: "The extent to which it, the taxing power, shall be exercised, the subjects on which it shall be exercised, and the mode in which it shall be exercised, are all equally within the discretion of the legislature to which the states commit the exercise of the power. That discretion is restrained only by the will of the people, expressed in the state constitution or through elections, and by the condition that it must not be so used as to burden or embarrass the operations of the federal government." (See also *Veazie Bank* v. *Fenno*, 8 Wall., 548; *Railroad Co.* v. *Penniston*, 18 Wall., 29; *Wilson* v. *Mayor of New York*, 4 E. D. Smith, 678–9.)

"Of late years it has been much the fashion," says Bell J., in 11 Pa. St., "to impeach the action of legislative bodies as unconstitutional when it happens not to accord with a party's notion of propriety and abstract right." "But," say the court in *Davis* v. *State*, 3 Lea, 378, "whether

a statute is 'contrary to the genius of a free people' is a question for the legislator, not the judge. It cannot be annulled upon supposed natural equity, the inherent rights of freemen, or any general or vague interpretation of a provision of the constitution beyond its plain and obvious import."

In *Kirby* v. *Shaw*, 19 Pa. St., 260, a tax additional to that laid on the county generally was laid on the inhabitants of the borough of Towanda, in Bradford county, Pa., "for the purpose of erecting the court house and jail now in process of building by said county." The tax was unequal, and the argument of inequality was urged at the bar, but overruled by the court. Mr. Justice Gibson, delivering the opinion of the court, said: " In England taxes were laid by the sole authority of the king till the reign of Edward the First, who bound himself and successors to exercise this part of the prerogative only with the assent of the lords and commons; but though it ceased to be royal and became national, it ceased not to be an attribute of sovereign power. In every American state, the people in the aggregate constitute the sovereign, with no limitation of its power but its own will, and no trustee of it but its own appointee. But this sovereign, from the nature of its structure, is unable to wield its power with its own hands; whence delegation of it to agents, who constitute the immediate government. But it is a postulate of a state constitution which destinguishes it from the federal, that all the power of the people is delegated by it, except such parts of it as are specifically reserved, and the whole of it is, without exception, vested in the constitutional dispensers of the people's money. As regards taxation, there is no limitation of it. Equality of contribution is not enjoined in the bill of rights, and, prob

ably, because it was known to be impracticable. Previous to the convention of 1838, we had double taxation of tracts of unseated lands lying foul of each other, of lands and mortgages of them, or ground rents issuing out of them, and, perhaps, of some other things. On the other hand, it was known that other descriptions of property had not been taxed at all. Since then, the exigencies of the state have brought to light many new sources of revenue, and more would have been discovered had more been wanted. No one imagined, however, that inequality had made the previous taxation unconstitutional."

" If equality were practicable, in what branch of the government would power to enforce it reside ? Not in the judiciary, unless it was competent to set aside a law free from collision with the constitution, because it seemed unjust. It could interfere only by overstepping the limits of its sphere, by appropriating to itself a power beyond its province; and by setting an example which other organs of the government might not be slow to follow. It is its peculiar duty to keep the first lines of the constitution clear; and not to stretch its power in order to correct legislative or executive abuses. Every branch of the government, the judicial included, does injustice for which there is no remedy, because everything human is imperfect. The sum of the matter is that the taxing power is left to that part of the government which is to exercise it."

In *Williams* v. *Cammack*, 27 Miss., 209, an act of the legislature of Mississippi, imposing by an arbitrary classification, a tax of ten per cent. on all lands lying within ten miles of the Mississippi river, and a tax of five per cent. on all lands lying ten miles or more from the river, for the purpose of building levees on the river was held to be constitu-

tional. The court said: "This power may be unwisely exercised or abused, yet it is a power entrusted by the constitution to the legislature, which, while exercised within the scope of the grant, is subject alone to their discretion, with which the judicial tribunals have no right to interfere, because in their judgment, the action of the legislature is contrary to the principles of natural justice."

So, though double taxation be inequal and unjust, it is not within the power of the court to interfere and declare it illegal when it contravenes no constitutional provision. So, the legislature have full power to determine what property shall be subject to taxation, and what shall be exempt: ( *Golden* v. *Chambersburg*, 8 Vroom, 260; *State* v. *Newark*, 1 Dutch, 315; *Toll Bridge Co.* v. *Osborn*, 35 Conn., 19, 20; *Wells* v. *Vermont Central Railroad Co.*, 14 Blatch, C. C. 426; *Lane County* v. *Oregon*, 7 Wall., 77.) There are, indeed, bounds to this power, an admirable illustration of which is found in *Loan Association* v. *Topeka*, 20 Wall., 655. This limitation is inherent in the nature of the power, but the law still is, as Mr. Justice Cowen well said in *Thomas* v. *Leland*, 24 Wend., 69, that "its exercise cannot be judicially restrained so long as it is *referable to the taxing power.*"

Such are the powers of the legislature over the subject of taxation in the absence of constitutional limitation of that power, and such the language of great judges, who, as Mr. Justice Story once said, regarded it their duty to interpret laws and not to wander into speculations upon their policy.

Now, it is manifest that a limitation of these powers short of a total prohibition of their exercise, must be construed to relate to those particular powers whose exercise it is designed, as evidenced by the language of the limitation,

either to limit or totally to prohibit. For instance, if the legislature have power to select the subjects of taxation, they thereby have power to exempt, either expressly or impliedly, all other property from taxation. Now, if this power be limited, it must be limited either expressly or by necessary implication. So, the legislature have power to divide the property selected for taxation into classes, and to prescribe different rates of taxation for each class; or they may prescribe different rules for the valuation of the different classes of property. Now, a limitation, simply, that "the rate of assessment and taxation shall be equal and uniform," does not relate expressly to other than the latter of these powers, nor can such limitation be made to extend to them without committing those blunders which have been so strongly and urgently pointed out in cases above. The power of the legislature to select the subjects of taxation, is not restrained by that limitation in any manner whatever. But property once selected, that property must be valued and taxed at equal rates. This is the whole extent of that limitation.

It follows that the legislature would have power, in the absence of limitation, to select for taxation one-county mortgages, and either to exempt two-county mortgages from taxation altogether or to tax them at a different rate. By this limitation, the power to tax at different rates is taken away, but the power to exempt remains precisely as it did before, and stands precisely on the same footing as the power to exempt any other property. As Mr. Justice Hunt well says, in *People* v. *Dolan*, 36 N. Y., 67–8, the rate of taxation has nothing to do with exemptions. The act does not provide for the taxation of two-county mortgages, and they are not within its operation. But, as we have seen, this implied

exception does not violate this clause of the constitution in any particular whatever. So far, then, as this particular clause of the constitution is concerned, the objection of want of equality and uniformity falls harmlessly against the mortgage tax law.

It may seem, at first view, that the latter clause of sec. 32, art. I, that taxation shall be equal and uniform, means something more than the first clause of sec. 1, art., IX. It seems certain, as the court say in *Bureau Co.* v. *Chicago R. R. Co.*, 44 Ill., 237, that taxation cannot be equal and uniform unless the rate of assessment and taxation be equal and uniform. The truth of the converse of this proposition is not so evident, yet it is in fact true, and those two forms of expression are in reality the equivalents of each other. They both mean that property actually taxed must be taxed equally. Some superfluous language may be found even in the constitution of the United States. It is not surprising, therefore, that some should be found in that of Oregon. Indeed, the provision in the constitution of Louisana, that "taxation shall be equal and uniform," has been construed not only not to prohibit exemptions, but to leave to the legislature full power to divide the objects of taxation into classes, and to subject each class to a different rate of taxation—that the constitution only requires the same proportional burden be imposed on individuals in the same class: (*State* v. *Lathrop*, 10 La., 401, 402; *Hodgson* v. *New Orleans*, 21 La., 301; *New Orleans* v. *Kauffman*, 29 La., 283.)

The constitution of Maine provides that all taxes upon real estate assessed by authority of the state, shall be apportioned and assessed equally, according to the just value thereof. Peters, J., said of this provision, in *Portland* v. *Water Co.*, 67 Me., 136, 137: "The requirement is not that

all real estate shall be assessed, but that whatever is assessed shall be apportioned and assessed equally." The provision in legal effect was equivalent to saying, that "taxation of real estate shall be equal and uniform." The construction put upon the clause by the learned judge follows strictly the rule above laid down.

The constitution of Kansas has the same provision as the first clause of sec. 1, art. IX, of the constitution of Oregon, and it was held that taxation of one class of property in an unorganized county where no other property was taxed, was not a violation of the provision. (*Francis* v. *Railroad Co.*, 19 Kan., 303, cited in *Wisconsin Central R. R. Co.* v. *Taylor & Co.*, 52 Wis., 78, 79.)

We have kept out of view, thus far, the second clause of sec. 1, art. IX, of the constitution, because the meaning of each clause is distinct in itself, and because if a law violates the constitution it is necessary to know distinctly why it violates it. And we have seen that the act of October 26th, 1882, considered apart, and as not providing for the taxation of two-county mortgages at all, does not violate the first clause of sec. 1, art. IX. But when we take up the second clause of sec. IX, we find that that clause actually forbids the exemption from taxation of any property whatever, except that specifically enumerated in the clause. This is the construction put on a like provision in the constitution of West Virginia. (*Chesapeake & Ohio R. R. Co.* v. *J. S. Miller, Auditor*, 19 W. Va., 408.) If this be the true construction, all discussion about the policy of taxing credits in this state, while this section of the constitution remains as it is, becomes irrelevant. It follows from this, that the legislature had no power to exempt two-county mortgages from taxation, nor did they, in fact, attempt to

do so. Had they made the attempt, the exemption, not the law, would have been void. What they have done, in effect, is to vary the mode of taxation of one-county mortgages from that of two-county mortgages, or, rather, the debt secured thereby. The debt which the two-county mortgage is given to secure, is, in fact, taxable under prior revenue laws, in the county where the mortgagee resides. The fact that the mortgagee may be a non-resident, and, therefore, not within reach of the tax collector, will not affect the principle, (*U. S.* v. *Riley*, 5 Blatch. C. C., 204) and the question then distinctly arises, whether a variation in the mode of taxation of property may, as in the case of this particular law, violate the provision that the rate of assessment and taxation shall be equal. The authorities, heretofore cited, are not without relevancy on this question. They show that the legislature must continue to possess the power to prescribe the mode of taxation, unless that power is either expressly, or by necessary implication, taken away. It is not taken away expressly. Then its exercise, in any given case, must necessarily tend to produce legal inequality in the rate of assessment and taxation, and this the court must know as a matter of law. Now, the rule of valuation, and the rate of taxation for state purposes, is the same throughout the state. No inequality, legal or otherwise, can be produced by taxing property in one county rather than in another for state purposes. If it be suggested that assessors in different localities may put different valuations on the same property, and thus produce inequality in fact, the answer is that the law prescribes for all the same rule of action; and the court cannot know judicially that the assessors violate the law. The presumption is, on

the contrary, that the officers do their duty, not that they violate it.

When we come to taxation for county purposes, we find A. complaining that he is not taxed equally with B., because, while they both live in the same county, he is taxed elsewhere on his one-county mortgage, while B. is taxed where he lives on his two-county mortgage. Now, is it not manifest that B. has as much right to complain as A.? And how is it possible for the court to decide between them without dealing with questions of fact, and thus submitting the constitutionality of a law to a trial by jury? Both complaints may be false. But if the law hurts one, it must favor the other, and no man can complain that he is taxed less than another. If the court could know judicially that the one or the other were hurt, it would be sufficient. But this is a fact to be proved, and one that does not necessarily exist, which is a fatal objection. The constitutionality of laws is not to be determined thus. Besides, if the several counties levy different rates for county purposes, the legislature might say to-morrow that every county in the state should hereafter levy a tax of ten mills, neither more nor less, for county purposes, and should pay all surplus revenue into the state treasury. What now becomes of the inequality of which A. complained? The law has now become constitutional by virtue of another and independent law, passed, it may be conceived, without the slightest thought of the first. There is a defect in a position which leads to such incongruous results. The defect lies in attempting to apply a limitation directed against the exercise of one power, to another power, neither within the letter, scope or intent of the limitation of the first. A limitation on the power of the legislature to fix rates of assessment

and taxation, has nothing to do with the power of the legislature to fix the *situs* of personal property for purposes of taxation. After the power fixing the *situs* has been exercised, then the property in its *situs* as fixed comes within the limitation, and not before. A limitation on this power must be sought elsewhere than in sec. 1 of art. IX.

The case of *Vail's Executors* v. *Runyon*, 12 Vroom, 98, shows that the legislature have power to change the *situs* of a particular species of personal property for purposes of taxation, without interfering with equality of taxation. The court also held in that case that a law providing that mortgages should be taxed in the township where recorded, provided the mortgagor chose to deduct the mortgage debt from his indebtedness, thereby leaving it at the option of the mortgagor whether he or the mortgagee should pay the tax substantially on the mortgage debt, was constitutional. In the course of the opinion, the court said: "If property be such in its nature as, upon ordinary principles of taxation, to be capable of having a two-fold *situs* for taxation, the legislature may select either as the place where the tax shall be laid. Chattels, considered under the leading classification of personality, follow the personality of the owner, and yet chattels may be so localized in use as to be taxable at the place where they are situated, as against the owner who resides elsewhere within the state."

(*State* v. *Falkenburge*, 3 Green., 320.) "A mortgage possesses the same dual characteristics." "The legislature may, I think, select as the *situs* of taxation of mortgages, either the political division where the owner resides or that in which the mortgaged premises are situate." "A law which subjects property to taxation, at the rates of taxation which are uniformly applied in the state in taxation for

state purposes, and in the county and municipality in which the property is taxable, in taxation for county and local purposes, observes the constitutional requirement of uniformity in the rules of taxation."

It follows that the objection of the want of equality, because of the change in the *situs* of property for taxation, may be dismissed as not within the purview of the constitutional limitation in question, and as wholly unsound.

The next and last objection to the act is that it is a special act. It was argued by Hill in *Allen* v. *Hirsch*, 8 Or., 412, that the word "special" in section 23, article IV, of the constitution, must receive its legal definition, and consequently that a special law under that section is a private law at common law. This view was sustained by the court, and it is difficult to see how any other conclusion could have been reached; for the rule is, and it applies to constitutions as well as to legislative acts, that " Whenever the legislature uses a term without defining, which has a definite legal meaning affixed to it, they must be supposed to use it in the sense in which it is construed in the law:" (*Hillhouse* v. *Chester*, 3 Day, 166.) The section in question was taken from the constitution of the state of Indiana, and the same construction has been put upon it in that state. (See *Toledo, etc., Co.* v. *Nordyke*, 27 Ind., 95.)·

It was suggested in *Dundee·etc. Co.* v. *School District No. 1*, U. S. circuit court for the district of Oregon, August, 1884, that *Allen* v. *Hirsch* was impliedly overruled in *Manning* v. *Klippel*, 9 Oregon, 376. This was an error. The question in one case was whether the act was special, and in the other whether it was local. It was never for a moment supposed in *Manning* v. *Klippel* that the act was a special act. It was a general act, partial in its operation

and therefore local.    An instance of a public local act similar to the one in that case is seen in *Marr* v. *Enloe*, 1 Yer., 452, where an act authorized "the county courts in ten of the counties in the western district, Obion being one, to lay a tax of twelve and one-half cents on each one hundred acres, for five years, to be applied in clearing out the streams in the counties, respectively."    It was not claimed in *Allen* v. *Hirsch* that the act was local, but that it was special, which is quite a different thing.    The court indeed made a slip of the pen in that case, in suggesting that the question was affected by the provision declaring that every statute shall be considered a public law unless otherwise declared in the statute itself, for that is but a rule of evidence: (*Beaty* v. *Knowles*, 4 Pet., 156.)    The decision, however, was not put upon that ground.

If a law be such that all persons placing themselves in the situations contemplated by the law, must take notice of it at their peril, such a law would seem to be a public law. Such is the case in laws levying taxes.    The incongruity between an object necessarily public, as taxation for general purposes of state, and the accomplishment of that object by a private law, is manifest.    All such laws are public in their nature.    "Public acts of parliament are binding upon every subject, because every subject is, in judgment of law, privy to the making of them, and therefore supposed to know them, and formerly the usage was for the sheriff to proclaim them at his county court:" (*The King* v. *Sutton*, 4 M. & S., 542.)

"An act of parliament," says Lord Holt, "concerning the revenue of the king, is a public law."    (12 Mod., 249.)    This is the case, though it be otherwise particular.

(*Knightly* v. *Spencer*, 1 Leon, 333, and see *Ingram* v. *Foot*, 12 Mod., 613.)

One reason why an act was held public in *Jones* v. *Axen*, 1 Ld. Raym., 120, was "because all the people of England may be concerned as creditors to these poor persons." And per Treby, C. J., "If the act concerning the bishops were to be adjudged now, it would be adjudged a general act." (See, also, *Unity* v. *Burraye*, 103 U. S., 447; *Smith* v. *Strong*, 2 Hill, 247; *Heridia* v. *Ayers*, 12 Pick., 334; *Young* v. *Bank of Alexandria*, 4 Cr., 384; S. C. 1 Cr., C. C., 458.)

It was argued in *Burnham* v. *Webster*, 5 Mass., 268, that an act of the legislature of Massachusetts, entitled, "An act for the preservation of the fish called bass, in Dunston river, in Scarborough, in the county of Cumberland," was a private statute. But Parsons, C. J., said: "We are of the opinion that the statute referred to is a public statute. It is obligatory upon all the citizens, and they must notice it at their peril."

So, in this case ; every citizen taking a one-county mortgage must take notice of the act which taxes the mortgage in the county where it is recorded. He is bound by it, and must pay the tax at his peril, whether he have actual notice of the act or not, which cannot be, unless, in judgment of law, he be supposed to know that the act has been passed. This is a decisive test that the act is a general act.

The judgment of the court below, accordingly, will be confirmed.

THAYER, J., concurring.

Upon the last point discussed, LORD, J., expressed no opinion.