Argued January 12, decided February 15, 1910.

## SEARS v. STEEL, STATE TREASURER.

[107 Pac. 3.]

HIGHWAYS—CONSTITUTIONAL PROVISIONS.

1. The purpose of Section 23, Article IV, Constitution of Oregon, prohibiting the passage of any special or local laws for laying, opening, working, and supervising highways, when considered in view of the practice of the territorial legislature of passing special acts authorizing the laying out of territorial roads, which acts were published in a volume, entitled "Local Laws," is to divorce the State from the business of special road building, and to leave that matter to be attended to by the counties under the general laws, and it prevents the invasion by the State of the regular method of laying out, opening, working, and supervising highways provided by general laws.

STATUTES—LOCAL LAWS.

2. A statute making an appropriation for the construction of a State road, and permitting the county courts of the counties through which the proposed road runs to lay a burden on the taxpayers of the county not shared equally by the taxpayers of the other parts of the State, is local, within Section 23, Article IV, Constitution of Oregon, prohibiting the legislature from passing local laws for laying, opening, and working on highways.

STATUTES—LOCAL LAWS.

3. A statute making an appropriation for the construction of a road, which, when constructed, shall be a county road in each of the counties through which it passes, imposes taxes on the people of the rest of the

State for the construction of a county road in the counties through which it passes, and is local, within Section 23, Article IV, Constitution of Oregon.

STATUTES—LOCAL LAWS.

4. Laws 1909, p. 278, making an appropriation for the construction of a State road through two designated counties, to be available when such counties have appropriated a specified sum therefor, and providing for the appointment of a commission co-operating with the county courts of the counties in the construction of the road, etc., is a local law, within Section 23, Article IV, Constitution of Oregon, because it operates only in two counties, though the title of the act indicates that the proposed road shall be a State road to extend entirely across the State, for no provision is made for the laying out of any road except through the two counties, and though the construction of the road would be a great public utility.

STATUTES—CONSTITUTIONAL PROVISIONS—"HIGHWAYS"—LOCAL LAWS.

5. The word "highways" in Section 23, Article IV, Constitution of Oregon, prohibiting the legislature from passing any special or local law for laying, opening, working, or supervising highways, means ordinary roads, and not railroads or canals.

From dissenting opinion of MR. JUSTICE KING.

STATUTES—SPECIAL OR LOCAL LAWS.

1. An act (Laws 1909, p. 278), authorizing any public road which in its nature is more beneficial to the community at large than to the inhabitants in the immediate locality of the road is a public and not a special or local law, within Section 23, Article IV, Constitution of Oregon, prohibiting the passage of any special or local laws for laying, opening, working, and supervising highways.

STATUTES—CONSTITUTIONAL PROVISIONS—HIGHWAYS.

2. The word "highways" in Section 23, Article IV, Constitution of Oregon, prohibiting the passage of any special or local law for laying, opening, working, or supervising highways, is used in the sense recognized and applied by the law writers on the subject, and includes every thoroughfare used by the public.

From Marion:  WILLIAM GALLOWAY, Judge.

Statement by MR. JUSTICE MCBRIDE.

This is a suit brought by James K. Sears, a citizen and taxpayer of Oregon, against Geo. A. Steel and F. W. Benson, respectively, as State Treasurer and Secretary of State, to enjoin the issuance and payment of a warrant under an act entitled "An Act appropriating $100,000 to aid in the construction of a State road from the Pacific Ocean via Crater Lake to the Idaho boundary, and to provide for the appointment of a commission to supervise the expenditure of such money and to superintend the con-

Sig. 18

struction of such road." This act is found on pages 278 and 279 of the Session Laws of 1909, and is as follows:

"Be it enacted by the People of the State of Oregon:

"Be it enacted by the Legislative Assembly of the State of Oregon:

"Section 1. There is hereby appropriated out of any moneys in the hands of the Treasurer of the State of Oregon, and not otherwise appropriated, the sum of $100,000 to be expended for the purpose of aiding in the construction of a State road from the Pacific Ocean to the Idaho boundary, via Crater Lake; the first section of the road to be constructed to be from Medford, Jackson County, Oregon, to the city of Klamath Falls, Klamath County.

"Sec. 2. Whenever the Governor of this State shall be advised that Jackson County has appropriated the sum of $50,000 to aid the construction of a road in said county from Medford, Jackson County, to a point on the west line of the Cascade Forest Reserve, on the route to Crater Lake, he shall appoint a commission to be known as the Crater Lake Road Commission, to consist of seven members, two of whom shall be residents of Jackson County, Oregon, two of Klamath County, Oregon, and thereupon twenty-five per cent of the sum hereby appropriated shall be available for use in Jackson County, $12,500 the first year, and $12,500 for each succeeding year for three years, and upon Klamath County appropriating $50,000 to aid the construction of a road from Klamath Falls to the east line of the Cascade Forest Reserve on the route to Crater Lake, the balance of the sum herewith appropriated shall be available for use in Klamath County, $12,500 the first year, and $12,500 for each succeeding year for three years.

"Sec. 3. That said commission shall receive no compensation for their services, except their actual expenses when engaged in the business of such commission. The business of such commission shall be to co-operate with the county courts of the several counties through [which] said road passes, and the proper federal authorities in the selection of a proper and feasible route for a road that may be constructed by the federal government through the government reserve surrounding Crater Lake, and to supervise the expenditure of said sum of $100,000, appro-

priated by the State; the $50,000 appropriated by Jackson County; the $50,000 appropriated by Klamath County, and all other moneys provided for the construction of the said road not in the boundaries of government reserve. Said commission shall have entire charge of construction of said State road.

"Sec. 4. That such money shall be expended only upon a county road, legally established, and no part shall be expended for securing a right of way for said road.

"Sec. 5. That said commission shall elect a president who shall preside at all meetings and a secretary who shall keep a record of all proceedings of the commission, and accounts of all moneys received and expended by the commission, and shall make a quarterly report of all the transactions of the commission, to be filed in the office of the Secretary of State.

"Sec. 6. That all moneys appropriated hereunder shall be paid out by the Treasurer of the State upon warrants of the Secretary of State upon the orders or vouchers of the commission, signed by the president and secretary.

"Sec. 7. The commission shall make all needful rules or regulations for the transaction of business and its places of meeting shall be Medford, Jackson County, Oregon, or at Klamath Falls, Klamath County, Oregon. Four members of the board shall constitute a quorum for the transaction of business, but a less number shall adjourn from time to time.

"Sec. 8. If a vacancy occurs in said commission, the Governor shall fill the same by appointment.

"Filed in the office of the Secretary of State February 23, 1909."

The complaint alleges that the Governor has been advised by the officials of Jackson County that said county has appropriated $50,000 to aid the construction of a road in said county from Medford to a point on the west line of the Cascade Forest Reserve on the route to Crater Lake, and that the Governor of the State has, in accordance with Section 2 of said act, appointed a commission of seven members, two from Jackson County, and two from Klamath County, known as the "Crater Lake Road Commission," to supervise the expenditure of said sum of

$100,000 and the sum of $50,000 appropriated by Jackson County, and the sum of $50,000 to be appropriated by Klamath County, and that said commission has duly organized and elected a president and entered upon the discharge of its duties; that the defendant Benson, as Secretary of State, threatens to, and will unless restrained, draw warrants upon vouchers issued by said commission and that the Treasurer will pay the same; that said act is in contravention of Section 7 of Article XI and Section 23 of Article IV of the Constitution of the State of Oregon; that the sole purpose of said act is to assist the counties of Jackson and Klamath in constructing an automobile and carriage road from Medford to Crater Lake and from Klamath Falls to Crater Lake for the use of tourists and pleasure seekers, and not for the purpose of constructing a State road from the Pacific Ocean to the Idaho boundary. After interposing a general demurrer, which was overruled the defendants answered, denying generally every allegation of the complaint except the passage of the act and the proceedings had thereunder, and further setting up, by way of affirmative defense, the following facts:

"That by the terms of said act the Legislative Assembly of the State of Oregon contemplated the construction of a State road from the Pacific Ocean to the Idaho boundary via Crater Lake, the first section of which was to be constructed from Medford, Jackson County, Oregon, to the city of Klamath Falls, Klamath County, Oregon. That the construction of said road will, when completed, connect the Pacific Ocean by the way of Curry, Josephine, Jackson, Klamath, Lake, Harney, and Malheur counties with the state of Idaho, and will, when completed, enable communication by way of such highway to be conveniently, economically, and effectively made between the counties of Curry, Josephine, and Jackson, west of the Cascade Mountains to the counties of Klamath, Lake, Harney, and Malheur particularly, east of the Cascade Mountains, and in general with the entire portion of the State of Oregon east of the Cascade Mountains. That the

said Cascade Mountains are a rugged chain of mountains separating the two sections of the State of Oregon, leaving about one-third of the State west thereof and about two-thirds of the State east thereof, and that the said contemplated road will, when constructed, pass over, through and along the most practicable available route between said respective sections of the State, and will afford to the inhabitants of said State and of the state of Idaho and to the general public the only available, practical, direct highway between said sections, connecting the Pacific Ocean with the state of Idaho.

"That the said counties of Malheur, Harney, Lake, and Klamath, and the said counties of Curry and Josephine are largely undeveloped, and without the construction of such highway will be practically inaccessible; that there is now no railway communication from any portion of Western Oregon to any portion of Eastern Oregon, excepting by way of the Columbia River on the northern boundary of said State, and that there is no railroad into the entire Southern Oregon territory excepting a railroad from the city of Portland to San Francisco, passing through the southwest portion of Jackson County and the northwest portion of Josephine County, and that the only railroad in Southern Oregon, other than this, or in any part thereof, is a portion of the California Northeastern Railway line from Weed, in Siskiyou County, in the state of California, to Klamath Falls, now under construction and about to be opened for transportation, which said line of road of the California Northeastern Railway Company extends into said Klamath County to Klamath Falls, a distance of approximately twenty miles.

"That said highway so to be constructed will pass over and across the Crater Lake National Park, situated in Klamath County, a small portion of which is situated in Douglas County, Oregon, which said Crater Lake National Park was credited by act of Congress approved May 22, 1902, (Act May 22, 1902, c. 820, 32 Stat. 202 [U. S. Comp. St. Supp. 1909, p. 617]), and constitutes a tract of land bounded on the north by the parallel 43 degrees 4 minutes north latitude; south by 42 degrees 48 minutes north latitude; east by the meridian 122 degrees west longitude; and west by the meridian 122 degrees 16 minutes west longitude, having an area of 249 square miles in the State of Oregon, and including Crater Lake, which

said Crater Lake National Park is under the exclusive control of the Secretary of the Interior, but which is a great national attraction, and that the construction of said highway will develop and constantly increase the commercial, business, and social intercourse of the citizens of other states and countries with the citizens of the State of Oregon, bringing to the people of the State of Oregon large sums of money, in the aggregate exceeding many times the cost and expense of constructing said highway; that said road will connect said national park and said Crater Lake with the outside world, and will render said lake and said park accessible.

"That it is now and for many years past has been the policy, rule, and custom of the executive department of the United States to build and construct through such of its national parks that contain scenic attractions roads and highways at enormous expense to the United States; that before expending such sums, or any part thereof, for such purposes, the United States require as a condition precedent thereof that the states in which said scenic wonders are located shall first cause said park to be connected with the outside world by public highways, properly and conveniently constructed and maintained; that in consideration of the establishment of the passage of said act hereinbefore mentioned and described in the amended complaint, and in consideration of the proposed construction of said highway therein authorized, the United States has, by its duly constituted authorities, commenced the preliminary work necessary to the construction of said highway over and across the Crater Lake National Park, and will, if the State shall construct said road, so authorized as aforesaid, complete the segment of road crossing said Crater Lake National Park, so as to make a continuous highway from Medford to Klamath, as aforesaid, and so that when the remaining segment of said road, between the Pacific Ocean and Medford and Klamath and the Idaho boundary state line, shall be constructed, said road will be a continuous highway crossing the entire State.

"Said defendants further answering herein allege that they are respectively Treasurer of the State of Oregon and Secretary of State of the State of Oregon, and have no personal or political interest in this cause, but present herewith the facts in relation to the said act and said highway as known to them. And defendants further

answering allege and aver that the said act mentioned, and described in the plaintiff's amended complaint was duly enacted by the legislative assembly of the State of Oregon and filed in the office of the Secretary of State on February 3 [23], 1909, and is printed and published as Chapter 191 of the Laws of Oregon for the year 1909, and that the said act does not attempt to nor will it create any debt against the State of Oregon of more than $50,000 or any sum in violation of Section 7 of Article XI of the Constitution of the State of Oregon, or otherwise, but the defendants allege that there are and will be funds available for the payment of any warrants that may be drawn pursuant to said act.

"And defendants further answer and aver that the said act is not special or local law for the opening or working on highways, or for the election or appointment of supervisors, or for the collection or assessment of taxes for State, county, or road purposes, or a local or special law, or any other than a general public statute in the interests of the public, and the same will greatly benefit the people of the State of Oregon, including the plaintiff."

The reply put in issue the new matter in the answer, except as to certain matters not here deemed material.

AFFIRMED.

For appellants there was a brief over the names of *Mr. William P. Lord, Jr., Mr. William D. Fenton, Mr. Lionel R. Webster* and *Messrs. Colvig & Reames,* with oral arguments by *Mr. Fenton* and *Mr. Clarence L. Reames.*

For respondent there was a brief with oral arguments by *Mr. L. H. McMahan* and *Mr. Andrew M. Crawford,* Attorney General.

MR. JUSTICE MCBRIDE delivered the opinion of the court.

1. The first objection to the constitutionality of the act in question is predicated upon the ground that it is in violation of Section 23, Article IV, of the constitution of this State. Said section is as follows: "The legislative assembly shall not pass special or local laws in any of the

following enumerated cases, that is to say,— * * 7. For laying, opening and working on highways, and for the election or appointment of supervisors." Is the act in question an act for laying, opening or working a highway, and, if so, is it a special or local act? If both these conditions concur, the act must be declared void. If either of them is lacking, it must be upheld.

In determining this question, we will first consider the intent with which this provision was placed in our constitution and the mischief which it was designed to remedy or prevent. Under the provisional government as early as June 22, 1844, Oregon had a system of laying out and locating highways, probably taken from the Iowa Code, and in 1847 an act was passed by the provisional legislature providing for a complete system of road work with supervisors who reported to the county commissioners, and which, in its general scope, was not essentially different from methods now in vogue. But at this early date, the provisional legislature seems habitually to have created territorial roads and appointed commissioners to locate and lay them out. Thus, we find an act passed December 12, 1846, appointing commissioners to locate and lay out a territorial road from the "town of Portland on the Willamette River" to the mouth of Mary's River in Polk County. Another, to authorize the laying out of a territorial road from Oregon City to the "Calipooyah" River. Another, from Oxford on the Willamette to John McCoy's farm on Muddy Creek in Linn County. Another from "Linn City to Zed Martis." Another, to improve and open the road "known as the southern route leading from the United States to Oregon." The employees on this enterprise were prudently required to furnish their own tools, "arms and ammunition." Another act provided for a public road from "Multnomah City" to the mouth of Mary's River. Still another, authorized the location of a territorial road from "Tuality Plains to

Clatsop Plains." Passing over the intervening years till
the session of the territorial legislature of 1850-51, we
find eight special acts authorizing the laying out of ter-
ritorial roads in various parts of the territory, all passed
within the space of less than a month, indicating that
the practice of logrolling among the fathers of the State
was not confined entirely to that specie of the employment
necessary in clearing up their farms. It is a well-known
fact that few of these roads, which, in the aggregate,
must have cost the infant community a considerable sum
of money for laying out and working, were ever of any
practical value or use, beyond the emoluments they fur-
nished to the commissioners and surveyors designated to
select the route. Under these circumstances, it was no
doubt thought by the framers of the constitution that
it would be well to divorce the State from the business
of special road building, and leave that matter to be
attended to by the counties under general laws. It has not
been noticed in previous decisions, but seems worthy of
mention here, that after the organization of the Oregon
territory, acts of the character above mentioned were not
published among the general laws, but were included in
a separate pamphlet or volume and entitled "Local Laws."
This practice, existing before and up to the adoption of
the constitution, tends to throw light upon the meaning
attached to the phrase "Local laws for the laying, open-
ing, and working of highways" as therein used. And in
the absence of anything denoting an intent to the con-
trary, we may fairly assume that the framers of the
constitution had in mind laws of the character then
treated as local by the officers of the territory whose prac-
tice and duty it was to compile and publish the acts
passed at each session of the legislature.

2. For several years after the adoption of the consti-
tution, the State Legislature took little or no part in the
construction of roads from one part of the State to

another, except in those cases where the State was made trustee of some grant or fund provided by the general government, such as The Dalles and Canyon City Military Road and others of like character. In *Allen* v. *Hirsch,* 8 Or. 412, the majority of the court lay special stress upon the fact that the road was to be built and paid for out of the 5 per centum of the net proceeds of the sales of public lands, which by the terms of the act admitting Oregon into the Union were to be devoted to internal improvements, and from the proceeds of sales of swamp lands, suggesting that no general tax upon the people was involved in the expenditure. It was also suggested that the road then in question was designed to unite the two great sections of the State, eastern and western Oregon, and was a State improvement for the benefit of the whole State and therefore not special. The decision in that case was by a divided court, Justice Boise dissenting, and the case has not been followed in its general scope in any subsequent decision. Thus, in *Manning* v. *Klippel,* 9 Or. 373, the court, having under consideration an act which prescribed different schedules of fees for county clerks in different counties of the State, says: "The act in question is a local act because, for one reason, it enlarges the sources of revenue from the counties therein, beyond those excluded from its provisions. One county, for instance, has a source of general revenue under the act denied to another. * * It follows that the act is local, and is, consequently, void."

Applying this rule to the act in question, if the proposed road is a State road, it permits the county courts of Jackson and Klamath to lay a burden upon the taxpayers of those counties not shared equally by the taxpayers of the other parts of the State. If, on the other hand, it is to be regarded as a county road in each of the counties through which it passes, it imposes taxes upon the people of the rest of the State for the construction of county

roads in Jackson and Klamath counties, and in either case it is local. See, also, *Ellis* v. *Frazier,* 38 Or. 468 (63 Pac. 642: 53 L. R. A. 454). In *Crawford* v. *Linn County,* 11 Or. 499 (5 Pac. 738), Mr. Chief Justice WALDO calls attention to the fact that it was not claimed in *Allen* v. *Hirsch* that the act was local, but that it was special, which is an entirely different matter. The decision of the court in *Allen* v. *Hirsch* seems to have opened the way for legislation of a similar character. In the session laws of 1885, we find an act appropriating $15,000 for the construction of a wagon road from a locality, bearing the significant name of "Hogem," to Cornucopia, in Union County. The act contains all the necessary "whereases," as to its public and general character, that were indicated by the court in *Allen* v. *Hirsch,* and no action seems to have been taken to prevent the expenditure of the money. The legislature of 1889, taking the cue from the decision in *Allen* v. *Hirsch,* passed nine road bills, appropriating sums varying in amounts from $8,000 to $15,000 and aggregating considerably above $100,000, seeming to fairly open up the flood gates for the unlimited increase of such appropriations, until the decision of this court in *Maxwell* v. *Tillamook County,* 20 Or. 495 (26 Pac. 803), which arrested further appropriations of this character until the last session of the legislature. Since we consider that case decisive of the one at bar, we shall briefly consider the points suggested and decided therein.

3. The title of the act in that case is "An act to appropriate ten thousand dollars to aid Tillamook County in the construction of a wagon road from the Nehalem River, in the north end of said county, to the Fuqua toll road, in the south end of the county," etc. Acts 1889, p. 169. The act designated certain persons as commissioners to locate the road, and provided that they might employ a superintendent to construct the same. The

commissioners were required to make a complete report to the county court of Tillamook County, whereupon said court should cause a verified statement of expenses of building the road to be filed with the Secretary of State who should thereupon draw his warrant on the State Treasurer. The last section of the act declared the great benefit that would accrue to the residents of Tillamook County and to a large number of people of the Willamette Valley by the speedy completion of the road, evidently with a view to bringing the road within the doctrine announced in *Allen* v. *Hirsch.* But these considerations do not seem to have substantially moved the flinty hearts of the members of the Supreme Court, as no attention is paid to them in the opinion.

The same question was raised on the trial that is raised here, namely, that the act was local and therefore in violation of Article IV, Section 23, subd. 7, of the Constitution. That able and learned jurist, Judge W. W. Thayer, appeared for the plaintiff Maxwell, and contended earnestly that there was no material difference between the case then at bar and that of *Allen* v. *Hirsch,* 8 Or. 412. We quote the following from his brief on file in this court:

"The respondent's counsel in the court below contended that the act was such a violation of the clause of the constitution of the State which provides that: 'The legislative assembly shall not pass special or local laws: 7. For laying, opening, and working on highways, and for the selection and appointment of supervisors'—as to render it void *in toto;* and so the court held, although its decision was in direct conflict with the decision of this court in *Allen* v. *Hirsch,* 8 Or. 412. There is no material difference in the two cases. In *Allen* v. *Hirsch* the legislature created a commission to survey, lay out, and construct a public road from the Sandy River in Multnomah County to Dalles City in Wasco County, appropriated $50,000 for its construction, and prescribed the duties of the commissioners in conducting the work. In the case at bar the legislature appropriated the sum

of $10,000 for the construction of a wagon road from the Nehalem River to the Fuqua toll road, also from a certain point on said road to Netarts Bay, appointed commissioners for a similar purpose, required said county of Tillamook to pay certain incidental expenses attending the work, and provided that upon completion of the proposed roads and rendition of an account of the expenses thereof, etc., to the Secretary of State, he should draw his warrant upon the State Treasurer for the amount expended, to the extent of the appropriation; and if the former act was not a special or local one, within the meaning of the said provision of the constitution, then the latter was not. The act in question was in its nature more beneficial to the community at large by far than to the inhabitants in the immediate locality of the roads; it had the effect to open, between the people of the Willamette Valley and a community occupying a section of country which extends more than fifty miles along the seacoast, includes three bays, and is sufficient in area to make several counties, an inland communication and commerce; and if the State is to be so hampered by its constitution that it is unable by means of a reasonable and judicious appropriation, to establish between two sections of it, separated by physical causes, so beneficial, necessary, and important a connection, its inhabitants should speedily take steps to relieve themselves from such narrow and ridiculous restrictions."

The court held this act to be both special and local; special, because it was limited to a particular county for a special purpose, and local, because it operated only on one county and had no application outside of it.

Now, the only difference that can be suggested between the case last referred to and the one at bar is that the present act operates on two counties instead of one. But we conceive that the act is still local in characer, notwithstanding this difference. "If a local act is one operating within a limited territory, or a special locality— 'one operatng upon persons or property in a single county or two or three counties would be local'—the act in question must be obnoxious to that objection." *Maxwell* v. *Tillamook County,* pages 503, 504, of 20 Or. (26 Pac.

805). "If the true criterion by which to determine whether an act is local or general is to inquire whether under it the people of the State may be affected by its operation, the answer to that question as regards the present act must be that it is local and not general. It operates in the county of Tillamook only, and has no force or effect in any other part of the State. If such a law is not local, it is difficult to understand in the light of the authorities, what species of legislation would constitute a local law." Now, applying the foregoing doctrine to the case at bar, the act operates only in two counties, Jackson and Klamath, and has no force or effect in any other county in the State. There is no escape from the conclusion that it is a local law.

4. But it is urged that the road proposed in the act, now under consideration, is a State road, intended, when completed, to extend entirely across the State and to unite remote sections thereof. It is true that the title so indicates, but, by the body of the act, no provision is made for the laying out, opening, or working of any road except through the counties of Jackson and Klamath, or in case both of these counties do not see fit to accept the overtures of the State and appropriate the required $50,000, then through Jackson County alone. And it is provided that such road shall be a county road, not a State road. Section 4 of the act is as follows:

"That such money shall be expended only upon a county road legally established."

The local character of the act is further indicated by the provision that as soon as Jackson County has made its appropriation of $50,000 to aid in the construction of a road from Medford, Jackson County, to a point on the west line of the Cascade Forest Reserve, on the route to Crater Lake, the Governor shall appoint a commission and thereupon twenty-five per cent of the sum appropriated shall become available for use in Jackson County and

$12,500 each year for three years thereafter, and upon Klamath County making a like appropriation, the same amounts become available in like manner. Each county stands alone. If Jackson County aprpopriates $50,000 and Klamath County does not, Jackson County, at the end of three years, has a county road, the beginning and terminus of which is selected by the State, and practically designated by the act itself. And there the road ends, as it begins, entirely within the confines of one county and is a county road. If Klamath County accepts the State's offer, we have two county roads, one in each county, entirely beyond the supervision of the State. We think that the constitutional provision invoked in this case was passed to prevent the invasion of the State of the regular method of laying out, opening, working, and supervising highways provided by general laws, and that this act violates the constitution in these particulars: First, that it requires the proposed county highways to begin at a particular point; second, that it appoints a commission to supervise not only the expenditure of the sum appropriated by the State, but that appropriated by the counties interested, and to have entire charge of the construction of the road, which is expressly declared in the act itself to be a county road.

5. These provisions make the act a local act for the "laying out, opening, and working of highways," as these terms are used in the constitution, and bring this case fully within the reasoning of the court in *Maxwell* v. *Tillamook County*, 20 Or. 495 (26 Pac. 803). It is urged that the construction of the road, here proposed, would be of great public utility, which, in a sense, is probably true. While the route indicated in the act does not suggest that the road would be of great commercial importance, and the Government publication submitted in evidence suggests that, owing to the altitude, a portion of the county traversed by it would be obstructed by heavy snowfalls

for part of the year, still there can be no doubt that the wonderful formation and the grandeur of the scenery at and in the vicinity of Crater Lake would attract to this route great numbers of tourists from every part of the country. But this cannot alter the fact that the act interferes with the plain defined by the general laws for the "laying out, opening, and working of highways," and in that respect is special and local. Whether the State, by general laws, may enter upon the construction of public highways, to be built, owned, and managed by the State, is not before us for decision, and upon that subject we express no opinion. The fact that locks have been built at Oregon City, and a portage railway at Celilo, by moneys contributed by the State, and that these improvements are in a sense highways, is also foreign to the question here under consideration, as it is very evident, from an examination of Section 23, Article IV, of the Constitution, that the highways therein alluded to are roads. The language "special or local laws for the laying, opening, or working on highways and for the election and appointment of supervisors" sufficiently indicates that ordinary roads, not railroads nor canals, were the subjects in the minds of the framers of the constitution when this provision was inserted. Neither can we consider the fact that the southern portion of the State has, to a great extent, been overlooked by the legislature in the matter of other public improvements, and perhaps in the local of other State institutions. It is no doubt true, and perhaps unfortunate, that such has been the case, but we are called upon to interpret the law, not to remedy wrongs or omissions which are only within the province of the lawmaking power to be corrected, either by general legislation or amendment of our constitution. The decree of the circuit court is affirmed.          AFFIRMED.

MR. JUSTICE KING delivered the following dissenting opinion:

1. I am of the opinion that the decree of the trial court should be reversed, and one entered dismissing the suit; and the importance of the question presented, and far-reaching effect of the conclusion announced by the majority, demands that I state the reasons impelling me to differ from my associates.

The only point properly presented by the pleadings, and entitled to serious attention, is the one considered in the opinion, as to whether the act in question contravenes Section 23, Article IV, of our State Constitution. I will therefore direct my attention solely to that inquiry, and in the determination thereof the well-settled rules, by which the constitutionality of all legislation is ascertained, will be kept in mind. It is a well-known, historical fact that, by the leading statesmen, lawyers, and jurists of the country, it was long deemed extremely doubtful whether it was within the province of the courts to pass upon the constitutionality of legislative enactments, or whether that was a legislative function only, but, after years of heated contests in both departments upon the subject, the point was finally, and I think wisely, held to be judicial. However, as a safeguard from judicial encroachment upon the legislative department, it became the universal and settled rule that no act shall be declared void by the courts, or come within the inhibition of any organic law of the land, unless its conflict therewith is so clearly pointed out as to be free from all rational doubt. See *Cline* v. *Greenwood*, 10 Or. 230, 241; *Simon* v. *Northup*, 27 Or. 487, 495 (40 Pac. 560: 30 L. R. A. 171).

The general rule to be deduced from all the authorities is that a "Constitution must not be interpreted on narrow or technical principles, but liberally and on broad, general lines, in order that it may accomplish the objects intended by it to carry out the principles of government," and the

legislative department of the State, unlike that of the national government, may enact any law not expressly or impliedly prohibited by its constitution; and in determining whether an act is in conflict, or inconsistent therewith, all reasonable doubts upon the question must be resolved in favor of the law thus assailed. For recent decisions by this court, holding to such effect, see *Kadderly* v. *Portland,* 44 Or. 118 (74 Pac. 710: 75 Pac. 222); *Straw* v. *Harris,* 54 Or. 424 (103 Pac. 777), and authorities there collated on the subject. I do not understand the majority opinion to question this rule of construction, but to hold, as it necessarily must, in order to reach the conclusion announced, that it is inapplicable to the case under consideration; that the act involved is, beyond a reasonable doubt, in conflict with Section 23, Article IV, which inhibits the passage of "Special or local laws * * for laying, opening, and working on highways, and for the election or appointment of supervisors." I concede that, if it appears beyond rational doubt that the act in question is either local or special, it contravenes this section of our organic law, and must fail. As to what constitutes a local or special act is fully considered and determined in *Allen* v. *Hirsch,* 8 Or. 412, which appears to have been the first decision bearing upon the subject, and has not been overruled, nor is it disclosed that the majority opinion so intends; an attempt is made to distinguish it, but, I think, unsuccessfully. It is there observed that this decision has not since been followed, presumably intending to imply that its weight is thereby impaired; calling attention, as being inconsistent therewith, the conclusion reached in *Manning* v. *Klippel,* 9 Or. 373. When it is remembered that the question passed upon in *Allen* v. *Hirsch* has been presented for the first time before this court in the case at bar, the fallacy of the former position becomes obvious; and, as I will later attempt to demonstrate, the facts in the case at bar are

stronger, and the question as to the validity of the act, accordingly, less doubtful, than in that case. As to the latter position, with reference to the effect of the holding in *Manning* v. *Klippel,* I think a careful examination of the act there under consideration so clearly discloses its local nature, as to make it manifest that that case is in no respect analogous to the one in hand. And, as to whether it is inconsistent with, or intended to overrule, *Allen* v. *Hirsch,* Mr. Justice WALDO, in 11 Or. 499, after distinguishing it from *Manning* v. *Klippel,* says: "It was suggested * * that *Allen* v. *Hirsch* was impliedly overruled in *Manning* v. *Klippel,* 9 Or. 376. This was an error. The question in one case was whether the act was special, and in the other whether it was local. It was never for a moment supposed in *Manning* v. *Klippel* that the act was a special act. It was a general act, partial in its operation, and therefore local." The statement expressed in the last sentence of the remark is also applicable to *Ellis* v. *Frazier,* 38 Or. 468 (63 Pac. 642: 53 L. R. A. 454), where the constitutionality of the bicycle tax was involved; that is to say, "it was a general act," partial in its operation, and, therefore, local. In each of these cases a different system for raising revenue for the localities there specified was provided, and, therefore, comes plainly within the inhibition of the constitution on the subject; for which reason I think it obvious that the views announced in those cases in no wise conflicts with the principles enunciated in *Allen* v. *Hirsch,* and can have no application to an act like the one here under consideration. So, also, in the case of *Maxwell* v. *Tillamook County,* 20 Or. 495, 506 (26 Pac. 803, 806), which the court distinguishes from that of *Allen* v. *Hirsch,* Mr. Justice LORD observing: "That act was treated as providing for an internal improvement—a State highway— in which the community at large was interested. The benefits of the road to the people along its route were

regarded as insignificant compared to the great advantages to the people at large, which it was its purpose to subserve." And, after further quoting from *Allen* v. *Hirsch,* showing the nature of the road, character of the country through which it passed, etc., continues: "It is thus seen that the road was regarded by the court as a great highway connecting two important divisions of the State, separated by a high range of mountains, through which travel and traffic might pass at all seasons of the year, and in which the people of the whole State were interested in like manner as they would be in the construction of a portage road to connect the navigable waters of the Columbia at the place of its obstruction. It was in this view that the court thought that the act could not be regarded as local or special; for the sphere of its influence or operation was not confined to a specified locality, but applied to the people of both sections of the State, and was, therefore, a matter of general concern. This is the ground upon which that case was decided."

I am aware that in the *Allen* v. *Hirsch* case it is noted that, under the terms of the acts, moneys appropriated were to come out of the "swamp land" and "five per centum" funds; the latter resulting from the proceeds of the sale of public lands, paid to the State by the Government for the express purpose of public road construction and internal improvements, and inapplicable to any other purpose. It requires but a casual reading of the opinion, however, to see that the decision is not predicated upon that point, nor is it so claimed. The observation, in fact, served no purpose, unless to remind the taxpayers that the conclusion reached would not directly increase their taxes. Attention is called to this expression in two or three subsequent opinions, but nowhere do we find it held that the conclusion reached in that case was based upon that point. But, whether the moneys appropriated were diverted from the particular funds men-

tioned, or from the general fund, it is difficult to perceive how it could have any bearing on the question there determined. That could in no respect furnish a basis for deciding whether the acts were local or special, for the constitution forbids legislation of a local or special nature, relative to highways, regardless of the funds to be affected thereby. Hence, while the "five per centum" fund was "paid to the State for the purpose of making public roads and internal improvements, as the legislature shall direct," there is nothing in this language indicating an intent to require, as a conditon precedent to the acceptance thereof, the State either to change or modify the constitution, inhibiting acts of local nature, concerning highways, etc.; for this fund has been, and can be, as readily appropriated under the general laws for such improvements as could any other fund. The "five per centum" fund might have been and could be as successfully applied for the uses contemplated, without changing the constitution as otherwise; it is patent that, when accepted by the State, it was with the implied understanding that no change in the fundamental laws of the State would become essential to its availability. As an illustration of the fact that no change in this respect was necessary, see Sess. Laws 1893, p. 3, wherein provision is made for the use of this fund, from year to year, upon the highways, throughout the various counties·of the State, under an act, the general effect of which is not open to question. Again, the funds used in the building of the roads alluded to in *Allen* v. *Hirsch* were, in fact, eventually paid out of the general fund, and not from the specific funds alluded to. It is clear, therefore, that the principles enunciated in *Allen* v. *Hirsch* are not affected, so far as concerns the views announced upon the constitutionality of the acts there involved, by reason of any observations respecting the "five per centum" or "swamp land" funds.

I am not unmindful of the attempt made by counsel for
Maxwell in the Tillamook case, to have it appear that
the questions there presented were analogous to those
involved in *Allen* v. *Hirsch*, but that should have no weight
here. This claim was made by Mr. Thayer as an advocate,
not as a jurist. He was doubtless conscious that the suc-
cess of his cause depended upon his success in this respect;
and his legal opponents, evidently cognizant of the danger
of his position being held tenable to their prejudice,
insisted the questions presented were in no way similar
thereto, concerning which they said:

"The road involved in *Allen* v. *Hirsch* was to all intents
and purposes a State road connecting remote portions
of the State together, and the act was for the construc-
tion of this road by the State as the title indicates. It
connected remote portions of the State, as above stated,
and was a matter of general concern. This is the ground
upon which the court based its decision in that case uphold-
ing the act. * * The difference between the acts involved
in *Allen* v. *Hirsch* and the one in question here, is so
marked as to make the claim of counsel, that they are
alike or even similar, appear ridiculous." See Briefs, vol.
1, p. 373.

This contention of counsel was sustained by the court
and the cause determined on that assumption. I am
unable to discover that the principles, as announced in
*Allen* v. *Hirsch,* have been shaken by any subsequent
declarations of this court, and, until overruled, must
necessarily stand as the law on the subject under dis-
cussion.

The only question, then, with which we are confronted,
is whether the act under consideration is local, special,
or general. The court, in the case last named, discusses
at length what constitutes local or special laws, as did
also the court in the Tillamook case; in each instance
announcing, in effect, the same test by which local, special,
and acts of general import may be ascertained. In the
latter case the views announced on the subject in *Allen*

v. *Hirsch* were impliedly approved, which views Mr. Chief Justice KELLEY, after quoting extensively and with approval from *State ex rel.* v. *Lean,* 9 Wis. 279, said: "The court in that case also says that it is undoubtedly difficult to draw an accurate line between general laws and those not general, and to establish a test that will be entirely satisfactory. But it was there held that the character of an act of the legislature, whether it be a 'general' law or not, is determined by the greater or less extent to which it affects the people, rather than by the extent of territory over which it operates, and that a law operating in a single county, but affecting the rights of all the people therein, is a general law. In the case of *New Portland* v. *New Vineyard,* 4 Shep. 69, it was held by the Supreme Court of Maine that an act annexing one town to another was a public act. The court says: 'Those are to be regarded as public acts which regulate the general interests of the State, or any of its divisions.' "

In the Tillamook case Mr. Justice LORD goes extensively into the difference between the act there considered, and that upheld by this court in *Allen* v. *Hirsch,* but limited the views announced to the particular acts there considered; at the same time adopting and applying, in effect, the definitions of local and special acts invoked in the former case. It is also made clear that the distinction between the cases is, that, in the Tillamook case, the road was a purely local county road, extending between two given points in one county, and recognized as affecting but one particular locality, without the advantage of being a road "in which the community at large have an interest"; in reference to which it is stated, in substance, that its advantages and benefits were confined almost exclusively to the inhabitants living along its route, operating only within its boundaries, and not, as in *Allen* v. *Hirsch,* connecting different divisions of the State; and in no manner a public improvement, extending its effects

outside of the particular locality where constructed. The test of being in one county or more is by no means a sufficient method by which to ascertain whether an act is local, special, or general. At most, it is but a circumstance to be considered, and in many instances may, and doubtless does, have great weight in ascertaining whether the act is local, special, or general; and it was evidently this application only that occasioned the reference thereto. As held in *State ex rel. v. Yancy*, 123 Mo. 401 (27 S. W. 381) : "Whether an act of the legislature be a local or general law must be determined by the generality with which it affects the people as a whole, rather than the extent of the territory over which it operates, and, if it affects equally all persons who come within its range, it can neither be special nor local within the meaning of the constitution." It follows that a law, operating in but one county, is not, necessarily, either a special or local act, but may, in many instances, be a general or public law; and, for the same reasons, an act operating in more than one county may, by reason of the locality and effect therein of the act, be local only. If this were not true, an act, otherwise local, might be made general by dividing the locality into two or more counties; and an act deemed general, because its provisions operate in two or more counties, might become local by merely changing the boundary lines of the district affected, the absurdity of which is obvious. It is therefore of but little importance, so far as the constitutional question is involved, whether the road shall be completed farther than to Crater Lake Park, the western part of which adjoins the eastern boundary of Jackson County; for, as will later appear, it will come within the above test.

I am at a loss to understand how a law may be deemed special or local in character, which does not confer a particular benefit upon the inhabitants of the designated locality or district, to the exclusion of the public at large.

A local or special act is, necessarily, such a law as is limited in its effect to certain persons, things, or localities. On this feature Mr. Sutherland, in his excellent work on Constitutional Construction, § 194, says:

"It is not necessary, in order to give a statute the attributes of a public law, that it shall be equally applicable to all parts of the State, nor that it extends in its operation to all of the inhabitants. "A statute may be general, and yet be operative only in a particular locality.' "

To the same effect see: *State ex rel.* v. *Baltimore Co.,* 29 Md. 516; *Mt. Vernon* v. *Evans B. Co.,* 204 Ill. 32 (68 N. E. 208). The constitution does not define a local or special law, leaving that duty to the courts and law-making department of the State; but, as disclosed by the authorities, cited with approval by the court in *Allen* v. *Hirsch,* the terms "local" and "special" acts, at the time of the adoption of the constitution were, and still are, well understood, and there is no justification for looking beyond the common law, either for the construction or application of these terms, as used in our fundamental law. On this feature I join with the court in *Allen* v. *Hirsch,* in the adoption of the views of that eminent advocate, Mr. W. Lair Hill, who, in his brief, in support of the acts there brought in question, said:

"These acts being shown to be neither special nor local, as those terms were defined by the common law, they are not such laws as the constitutional provision was intended to prohibit, unless it appears from the constitution itself, or from its historical surroundings, that the convention by whom the constitution was framed were induced to employ the well-known terms of law in a sense different from their well-known legal meaning. No other deliberative body that ever sat in Oregon had among its members so many distinguished lawyers, as had that convention. In its roll of membership appear the names of no less than seven who have been supreme judges, including all the judges of the Supreme Court at this time (1880). It was presided over by one whose reputa-

tion as a jurist is co-extensive with the nation. Another of its members has since been Attorney General of the United States. And, besides these, there were many lawyers whose achievements at the bar form a part of the public history of the country. One does not readily conclude that a convention controlled by men of such character, in framing an instrument which, by its nature, would be expected to be written in the peculiar language of the law, which was to be interpreted and administered by the courts of law, and which was to control all future legislation of the State, would employ the technical terms peculiar to their art and profession, in a sense different from their technical and legal sense, and then furnish no key or clue by which their intended sense could be discovered. But highly improbable as such a conclusion would be, it must be adopted before the court can hold these acts to be either special or local within the meaning of the constitution."

Extrinsic evidence of the character invoked in support of the majority opinion on this feature is deemed justifiable only in extraordinary cases, of which I submit the case at bar is not one. When, therefore, we take into consideration that the words "local" and "special," as applied at common law, had well-understood and well-settled meanings, and, further, that the jurists, who sat in the case of *Allen* v. *Hirsch,* and who had been members of the convention, and assisted in the framing and adoption of the section under consideration, did not invoke the construction adopted by the majority herein, nor find it necessary to resort to the method by them used for that purpose, but applied the rule of interpretation suggested by the eminent counsel above quoted, the reasons why we should adhere to the rule of construction there invoked, and which for 30 years has stood in our reports as a correct interpretation of the law upon the subject, become apparent. The test there applied, after considering various decisions upon the question, is as follows: "The general principle to be deduced from all the authorities seems to be this: That whenever an act of the legislature

authorizes any public road or other internal improvement to be made or other act to be done, which in its nature is more beneficial to the community at large than to the inhabitants in the immediate locality of the road, or other internal improvement, such act is to be considered a public and not a special or local law." In this connection Mr. Chief Justice KELLEY further observes that, during the 10 preceding years of territorial government, it had been the practice of the legislative assembly to pass special laws, laying out territorial roads from one point to another, sometimes in the same county, and at other times in different counties, the expense of which was, by the legislature, imposed on the several districts through which they passed, and that "these burdens thus imposed on the people of special localities were considered as onerous, and the whole system of laying, opening, and working territorial roads came to be regarded as an exceedingly vicious mode of legislation, which interfered with the regular road system of the territory. And it was to destroy and prevent that kind of legislation that the inhibition referred to was inserted in the constitution." It will thus be seen, from the observation of Mr. Chief Justice KELLEY, concurred in by Mr. Justice PRIM, each of whom sat in the convention and assisted in framing this section, that the adoption thereof was for the purpose of preventing interference with the general road system throughout the territory, and from imposing upon the people, in the immediate vicinity of the roads laid out, the burdens thereof. Under these circumstances, the views of these eminent jurists should certainly outweigh the method suggested in the majority opinion, by which to ascertain the intent of the framers of the constitution; concerning which it is pointed out that enactments of this kind were grouped by the local officers (who doubtless were not learned in the law) as special laws, etc. True, one of the justices dissented, but, as

he stated his conclusionly only, and not his reasons from which his conclusions were deduced, we have no way of knowing his views on this feature. It is highly probable that he thought the building of the roads, provided for in the acts there involved, would not result in any general or public benefits, but would inure merely to the benefit ,of those along its course, making the acts, in their scope, local only, and therefore special. Or he may have had other reasons; whatever they may have been, his dissent throws no light on the subject.

It will be observed that the act before us does not thrust upon either of the counties, through which the contemplated road may pass, the burden of any part of the expense, but leaves it optional with them; and this expense, consisting of but one-half of the entire cost, if contributed, will be borne by the entire county or counties through which the road passes. It will not fall directly upon the property of the owners in the immediate vicinity of and along the intended route, avoiding thereby the mischief evidently designed to be remedied by the adoption of the section under consideration. The act, therefore, does not come within the class sought to be obviated by this section of our organic law.

In *Maxwell* v. *Tillamook County,* 20 Or. 495 (26 Pac. 803), the court recognized the true criterion to be to inquire whether, under the act, the people of the State would be affected by its operation; holding that, if affected, the act became general. Measured by this rule, in conjunction with those quoted, is the act before us local or special? The general purpose of the road is declared in the title of the act, and it is elementary that courts may, as an aid in determining its intent, look to the title of an act. The title, in effect, declares the ultimate purpose of the law to be the construction of a roadway that will connect the eastern and western sections of the State; and when considered, together with the body

of the act, aided by judicial knowledge of the topography of the country, including such knowledge of the public roads and highways, it appears to have the effect claimed for it. In the acts considered in the Tillamook and Allen-Hirsch cases judicial knowledge was taken of these matters; in fact there is but little doubt as to the right to do so. See *State* v. *Carmody*, 50 Or. 1 (91 Pac. 446: 1081, 12 L. R. A. (N. S.) 828); *Peterson, Adm'r* v. *Standard Oil Co.*, 55 Or. 511 (106 Pac. 337) in which the writer of the majority opinion quotes with approval from *Town* v. *Gregory*, 53 App. Div. 350 (65 N. Y. Supp. 867) announcing the rule on the subject, with illustrations, under which there can be no doubt as to our rights in this instance. Judicial knowledge will therefore be taken of the fact that, beginning at a point on Snake River, east of Ontario, where, through the aid of an appropriation from the State, a bridge (costing approximately $30,000, of which the State has paid one-third, and the locality where situated, the balance) spans the river, connecting the states of Idaho and Oregon, a public road extends in a westerly course through Malheur, Harney, Lake, and Klamath counties, passing through Klamath Falls; that this road, through the principal mountainous district where construction is difficult, is extensively traveled, and was built and is maintained in good traveling condition by the respective counties through which it passes. Also, that the city of Medford is connected with the Pacific Ocean by well-traveled county roads; that the contemplated route from Medford to Klamath Falls will pass through a very mountainous and heretofore untraversed section, and, when completed, will connect those eastern and western divisions of the State, so made by the Cascade Range, with the other roads mentioned, thereby connecting the eastern boundary of our State with the Pacific Ocean, as suggested in the title of the act. Again, along the greater part of the way between

Medford and the point where the road reaches Klamath County, but little, if any, settlements appear. As stated by one witness, between Rogue River Falls and Crater Lake, a distance of 40 miles, two farmers, residing within two miles of the falls, constitute the only residents along the route. It is thus evident that the general purpose of the road is not for the benefit of those in its immediate vicinity, but for the uniting of two important divisions of the State. It is clear, therefore, as stated by Mr. Justice LORD in the Tillamook case, when alluding to roads involved in the *Allen* v. *Hirsch* suit, that "the benefits of the road to the people along its route must be regarded as insignificant compared with the great advantages to the people at large, which it purposes to subserve."

In the majority opinion it is said:

"If the proposed road is a State road, it permits the county courts of Jackson and Klamath to lay a burden upon the taxpayers of those counties not shared equally by the taxpayers of the other parts of the State. If, on the other hand, it is to be regarded as a county road, in each of the counties through which it passes, it imposes taxes upon the people of the rest of the State for the construction of county roads in Jackson and Klamath counties, and in either case it is local."

As I understand it, the right of the county court of any county to appropriate money for the building of roads is not open to question, unless the question of indebtedness in excess of the constitutional limit arises, which point is not here involved. As I view it, the fallacy in this position lies in assuming that, before the State, under the constitution, has authority to make an appropriation for any road, it must be a State road, or exclusively under the State's control; or that no appropriation whatever, under any state of facts, may be made for a county road. This is not the law, and, so far as I can ascertain, it has not heretofore been suggested by any decision of this court that it is the law. Moreover, since the road, under

the act, is to be recognized as a county road, the question of whether the county might contribute to a State road is not before us. Nor does it become important that the road or divisions thereof, when completed, be turned over to, and come under the care and charge of, the counties in which constructed. This requirement constituted one of the provisions in each of the acts involved and upheld by the court in *Allen* v. *Hirsch.* And, under any view, this feature becomes immaterial, for the counties are but mere departments or agencies of the State, charged with the performance of its duties, for and on its behalf, and subject always to its control. *Straw* v. *Harris,* 54 Or. 424 (103 Pac. 777) ; *Yamhill County* v. *Foster,* 53 Or. 4 (99 Pac. 286).

I can see no merit in the contention that, if this act is upheld, citizens from other parts of the State, by the payment of taxes, must contribute towards the construction of this road, which they cannot or will not use, etc. This position not only overlooks the fact that the highway, when open, would necessarily be subject to use by the people of the entire state, as well as by the nation and the world at large, but constitutes a part of the sophistry invoked against practically every public movement and improvement in the past, local and national, requiring an appropriation of public funds. The citizen, with large property interests and no children, has said, and, even in this enlightened age is sometimes heard to say : "Why should I be taxed to support the public school system, when I have no children to educate, while my neighbor, with less property, but many children, is the recipient of the benefits ?" And those who do not care to send their sons and daughters to the State universities, normal schools, or other educational institutions, use a like argument against the maintenance of these institutions; the same contention being often made with respect to appropriations for the eleemosynary institutions—all, in these objec-

tions, forgetting and overlooking the public benefits accruing therefrom, in which all share as citizens of the commonwealth, whether conscious thereof or not. Again, the funds, appropriated in support of all State institutions, first inure to the advantage of the particular locality where situated, as do the funds disbursed for the world's great fairs; yet who, in this day, would urge that argument as grounds for holding acts, appropriating money, unconstitutional. All have grown to recognize the good inuring to the general public, and to the State at large, in such instances, regardless of the greater proportionate advantages to the immediate localities where the funds are disbursed. The same may be said of the hundreds of thousands of dollars appropriated from the public treasury for the locks at Oregon City, and for the construction of the portage railway between Celilo and The Dalles. Each of these particular localities is especially and enormously benefited by these appropriations, yet will any one seriously contend that the general public, or the State as a whole, is not immensely benefited thereby; and that, taken as a whole, the benefits accruing to the State at large, do not outweigh those of the particular localities, where the improvements are made? The portage railway, like the roads involved in *Allen* v. *Hirsch,* except on a more extensive and expensive scale, connects two large and important divisions of our State, and is of immense commercial advantage to the general public; uniting, in the northern part of our State, the great wheat fields and other resources of Eastern Oregon, with transportation west of the Cascade Range. The locks at Oregon City likewise, so far as applies to that part west of the Cascade Mountains, connect in commerce the northern part of the State with its southern counties. Now, the southern and northeastern sections of the State contribute, in proportion to their wealth, to the fund, bringing into, and continuing in existence, these two great

enterprises, yet must remain content with receiving only their proportion of the benefits accruing to the entire commonwealth, of which they form a remote part. This is accomplished under the same section of the constitution as here assailed. In the case of the locks at Oregon City this right was upheld by this court in *Oregon* v. *Portland General Electric Co.*, 52 Or. 502, 531 (98 Pac. 160, 161) in reference to which Mr. Justice EAKIN observes: "The State has the right to improve this highway for the purpose of navigation. It may do this itself, or it may delegate to another the authority to do so."

2. The constitution does not define a highway, and the term must therefore be applied in its usual and common-law sense. The State, at the time of the adoption of the constitution, had, as highways, trails, roads, and navigable streams, while railways were known in the "Far East." It must be presumed that they had in view not only the highways used for the travel then in vogue, but include those improved methods of travel likely to develop. I deem the contention that the constitution had reference only to the class of highways then in use in the territory to be without merit. It is apparent that the terms were intended to be used in the sense recognized and applied by the law writers on the subject, among the English speaking nations. Kent's Commentaries vol. 3, p. 432, reads:

"Every thoroughfare, which is used by the public, and is, in the language of the English books, 'common to all the King's subjects,' is a highway, whether it be a carriageway, a horseway, a footway, or a navigable river. It is, says Lord Holt, the genus of all public ways."

On the same point Bouvier says: "The term highway is the generic name for all kinds of public ways, whether they be carriageways, bridleways, footways, bridges, turnpike roads, railroads, canals, ferries, or navigable rivers." See, also, *Railroad* v. *Com'rs Colfax Co.*, 4 Neb. 450, 456;

Sig. 19

*Packet Co.* v. *Sorrels,* 50 Ark. 466 (8 S. W. 683) ; *Ry. Co.* v. *Oklahoma City,* 12 Okl. 89, 94 (69 Pac. 1050) ; *Northern Trust Co.* v. *Jackson,* 60 Minn. 116 (61 N. W. 908).

Can we, then, consistently hold that, under this section of our fundamental law, the State has the right to appropriate money for the purpose of connecting, on our northern boundary, two divisions of the State, requiring the taxpayers, in remote sections, to contribute to such appropriation, merely because the means of transportation is in cars upon this highway, and at the same time hold that the same range of mountains may not be pierced by another and less expensive class of highways—wagon roads—near its southern boundary, opening thereby the only practical means of communication available to the people of the two separted localities of such remote section? And shall it be held that the people along the Willamette River, through the generosity of the State appropriation for the locks at Oregon City, shall be commercially united north and south, and, at the same time, deny a like privilege to the citizens of the two extensive divisions of our State east and west of the Cascade Range near our southern borders? I think not. Such inconsistency was certainly not intended by the conceded broadminded, far-seeing, and able men, of which the convention was composed. It is not a question, as intimated, whether the southern part of the State has been, or is receiving its proportion of State appropriations, but whether one rule of construction shall be applied, when disbursements by the State shall be made for highways in the northern and northwestern part of the State, and a different rule prevail when disbursements are authorized for highways in the southern and southeastern districts. I deem the precedent established, by holding the act under consideration void, to be far-reaching and portentous in its resultant effects. It essentially means that one rule of constitutional construction may be applied to

one part of the State, and a different rule to another, else no appropriation may hereafter be made, either for the further opening of the Willamette River, or for the extension, completion, or operation of the railway between Celilo and The Dalles. I do not believe the framers of our constitution ever intended such results; their language is incapable of such construction, and requires a contraction of all rules of interpretation to so hold; and does violence to the principle that, in order to carry out the accepted theory that governments are intended to protect and secure life, liberty, and property, constitutions must be construed liberally and on broad, general lines.

It is argued by counsel and intimated in the opinion, that the section in question was intended to prevent "log-rolling" by the legislators. It might not be out of place to note that if this were the spirit that moved the distinguished members comprising the convention, it must be conceded that their foresight was extremely limited, else, to have been consistent, practically all legislation should have been inhibited, and primitive conditions left to prevail; for the weakness, in this respect, had then long been manifested by legislative bodies, territorial, state, and national, without reference to any particular form or class of legislation, having first made its appearance, and recognized, in the earliest history of legislation in the nation, as one of the dangers incident to a republican form of government. The question of public highway improvements, throughout the country, is assuming greater proportions than was probably ever dreamed of by the framers of the constitution, affording another reason why our fundamental laws should be construed "on broad, general lines," rather than the converse of that rule. This was doubtless realized, when, in 1870, $200,000 was appropriated for use upon the locks at Oregon City, and when more than that sum was, by the legislature, applied in the construction of the railway at Celilo. This

question is fast becoming of State wide and national importance. Our President recently said, in reference to a movement inaugurated in Virginia, looking to the construction of a road from the national capitol to Richmond: "I regard this as part of the general 'good roads' movement in the country, and I have pleasure in saying that there is no movement that I know of that will have a more direct effect to alleviate the difficulties and burdens of the farmers' life, will stimulate traffic and add to the general happiness of the people more than the establishment of good roads throughout the country." And thus it may be said of the law under consideration; it is the inception of a movement that will doubtless bring in closer touch the citizens of our commonwealth, stimulate traffic and other intercourse, and thereby add to the general happiness and prosperity of the people of the entire State. Especially is this true, when, in connection therewith, we take into account another and equally important feature, to which this brings us, and which, thus far, we have passed unnoticed.

Along the line of this contemplated road, and within the western boundary of Klamath County, is what is known as the "Crater Lake National Park." Of this park and its general nature and advantages we may take judicial knowledge; but in determining whether the benefits to accrue to the State at large are sufficient to make the highway one of public rather than local importance, we are not left to this resource alone. We have, together with plaintiff's admission in his pleadings, the uncontradicted testimony of witnesses, whose high standing and information on the subject are unquestioned. That testimony of this class is admissible is held in *Bridal Veil Lumbering Co.* v. *Johnson,* 30 Or. 205 (46 Pac. 790: 34 L. R. A. 368: 60 Am. St. Rep. 818). There the point was whether the use, for which the suit to condemn was instituted, was a public use; involving the question as to

whether the taking of the property there sought to be condemned would be in violation of the constitutional rights of the owners thereof; for if the uses, for which it was to be appropriated, were not public, the right to condemn the property came within the inhibition of the constitution on the subject.   In considering this point Mr. Justice BEAN, after observing that whether the use for which condemnation proceedings may be instituted is public is always a question for the courts, holds that evidence *aliunde* may be resorted to for that purpose.   To the same effect, *Dallas* v. *Hallock,* 44 Or. 246 (75 Pac. 204) ; *Wolfard* v. *Fisher,* 48 Or. 479 (84 Pac. 850: 87 Pac. 530: 7 L. R. A. (N. S.) 991) ; *Grande Ronde E. Co.* v. *Drake,* 46 Or. 243, 248 (78 Pac. 1031) ; *Chicago & E. I. R. Co.* v. *Wiltse,* 116 Ill. 449 (6 N. E. 49) ; *In re Niagara Falls Ry. Co.,* 108 N. Y. 375 (15 N. E. 429).

The Crater Lake district is in the northwestern part of Klamath County, adjacent to Jackson County, within the government forest reserve, and, prior to 1885, was practically unknown; but in 1902 was, by the government, set aside as a national park, since which time it has been known as "Crater Lake National Park."   It contains, approximately, 160,000 acres, or 250 square miles of territory, the grandeur of which is unexcelled, either on this continent or elsewhere, and, when properly opened by traversable highways, promises to rank, through its wondrous scenic beauty and unparalleled geological formation, as one of the most valuable resources of our State.   This great natural wonder may be more fully understood and appreciated after quoting from a work on the subject, written a few years ago by Mr. Will G. Steel, one of the principal witnesses herein; his description reads:

"Professor Joseph Le Conte was a great admirer of Yellowstone and Yosemite.   Many years ago, when standing together on the rim of the lake, I asked him how

it compared with them. With deep emotion he replied: 'Yellowstone has its glories, and so have the Yosemite and Crater Lake, but their grandeur is not in common. You cannot compare unlike things. There is but *one* Crater Lake.' The overpowering impressiveness of its grandeur cannot be described, and no idea of its masterful influence over the human mind can be conveyed by words. It must be seen to be appreciated. It stands alone in its class in all this world. It has no peer, no rival to divide the charms, but stands alone, the one, the only Crater Lake. Probably the six greatest natural wonders of the American Continent consist in the Grand Canyon of the Colorado, Niagara Falls, Mammoth Cave, Yellowstone, Yosemite and Crater Lake, no two of which can be compared, for each one is pre-eminent."

Mr. Steel appears eminently qualified to give evidence bearing upon the issues presented, and his testimony before the trial court so fully, clearly, and specifically points out the facts, from which the advantages accruing, and to inure to the State at large, must necessarily be deduced, that it is fitting to quote extensively therefrom. In effect he said:

"I have lived in the State of Oregon for thirty-seven years, and am a resident and taxpayer at this time. I am well acquainted with the geographical conditions of Jackson and Klamath counties. I have made the geographical conditions of these two counties, including Crater Lake, a study for twenty-four years. The Cascade Range of mountains is a rugged chain of mountains, separating the entire State into two geographical divisions, known as Eastern and Western Oregon. Crater Lake is situated in the northwest portion of Klamath County. The lake itself is all in Klamath County, but the national park touches a small portion of Jackson County. Crater Lake was, originally, one of the greatest mountains on the American continent. It became a volcano, and blew a great deal of fine stuff over the country; subsequently, instead of blowing out the mountain, it telescoped—that is, the mountain disappeared, leaving a caldron a little over five miles in diameter and four thousand feet deep; possibly it was deeper in the beginning; since then it has

filled up to a depth of two thousand feet with pure, clear water. It is known as Crater Lake. It was named in 1896, as was the mountain, Mount Mazama, by the United States government. This mountain involves what we call the rim of Crater Lake. Crater Lake—Mount Mazama—would be immensely larger than Mount Hood. Mount Hood could be put inside of Crater Lake, and still leave an enormous body of water and dirt. Crater Lake is, approximately, a little over five miles in diameter It is a little longer from the northeast to the southwest. The depth of its waters varies. I sounded the lake for the government in 1896, and the deepest sounded at that time was 1,896 feet. This lake is surrounded by precipitous hills. There is one narrow niche, 500 feet of solid rock. Places around the lake vary from that to 2,000 feet at the highest point. The government has built a trail, which passes down the side on the inside a distance of 2,300 feet, to make a descent of 1,000 feet; this is, practically, the only place of descent. Wizard Island is located in this lake on the west side, the cinder cone being 845 feet above the water. Immediately north of this island is a similar formation, the top of which is 600 feet below the surface of the water. Wizard Island is, itself, a scenic attraction, on account of the many cinder cones. After the mountain telescoped the foaming lava kept pouring, until it was up to an elevation of 845 feet, then the flow ceased, and it fell back, leaving a sort of basin. It has cooled, leaving an absolutely perfect crater about 500 feet in diameter. No other case has been discovered by the civilized world, where a mountain of tᴜᴉs character has telescoped. The material that has telescoped has gone, and neither the government nor scientists have been able to find where it went; there is no vent. There are other cases where mountains have telescoped, but nothing of this character. No man ever did or ever can stand upon the walls of Crater Lake and view it, and go away and tell his neighbors about it; it is a human impossibility; you have to see it to appreciate it. I saw Mr. Garfield, then Secretary of the Interior of the United States, go up to the lake, stop, and simply remove his hat, and you could see the emotion of the man; he said: 'I can do no more. I cannot tell it. I cannot express it. I can only, in reverence, remove my hat.' I have taken the subject of this national park up

with the government for twenty-four years constantly, and am always met with the proposition: 'What is your state doing? When your state acts, we will act.' I went to Washington last winter to interest the United States forestry service—Mr. Pinchot, who is chief of the United States forestry service, and has charge of all the forest reserves of the United States. He said: 'If you will have your state act, that money is ready to be applied, on condition your state acts first.' The United States 'good roads' division was interested in the matter by Mr. Garfield, and has detailed an officer, who is now in Southern Oregon, examining this proposition, with the intention of taking hold of it for the United States government. That portion of this proposed road, which lies within the forest reserve and the national park would be the most expensive; and the expense of that segment would be borne entirely by the United States government. All that would be asked of the State would be to connect the national park road with the outside world. The proposed road from Medford in Jackson County, Oregon, and Klamath Falls, in Klamath County, Oregon, by the way of Crater Lake, is the only practicable route and is an easy grade. It follows the grade of Rogue River for about sixty miles from the city of Medford, and crosses at Bibee Bridge. It crosses Mill Creek just above what is called Rogue River Falls. The Rogue River Falls, or Mill Creek Falls, are a great scenic attraction. The falls, which are 180 feet high, are on this route, about forty miles from Crater Lake. Between these falls and Crater Lake probably two families are living; there is no other settlement, and there are no other persons living along or near the proposed road. In the distance of about fifty-seven miles there are no persons upon whom would devolve the liability of keeping a general road in repair, because there is nobody living there. The government in six years has expended $23,315 on this park, and the only reason the amount has not been increased many times may be explained as follows: I took the matter up with Secretary Garfield and tried to get an appropriation in keeping with what I think are the rights of Crater Lake; he said: 'Mr. Steel, the government will spend all the money that is necessary to improve that park, when it is connected with the outside world with a good road. It will not do that, until it is done.' Yosemite and Yellow-

stone Parks are connected with the outside world. There is no comparison between the scenic attractions of Crater Lake with Yosemite and Mount Rainier Parks. Crater Lake is far superior. The geographical and geological features of Crater Lake and Wizard Island, and other scenic points of interest, as represented in the report prepared by Diller of the Geological Department of the United States, are truthfully represented. I have carefully examined and am familiar with it. Mr. Diller was sent by the United States government to study Crater Lake for several years. Professor Diller is probably one of the finest geologists in the world. Notwithstanding the lack of roads by which to reach Crater Lake, the government statistics show that five thousand people visited the park during the year 1908."

Judge J. H. Scott testifies to his long connection with the good roads movement, and, in effect, concludes:

"If a road of easy access were constructed from Rogue River Valley to the Klamath Valley, by way of Crater Lake, it would be a great benefactor of the State of Oregon. It would connect the Willamette Valley to the southern parts of the State with that of the great territory lying east of the Cascades, and be for the general welfare of the entire State in many respects."

Mr. A. C. Jackson testified that he was the advertising agent of the Oregon Railroad & Navigation and Southern Pacific lines in Oregon, having held this and similar positions for eighteen years; that he had noted the scenic attractions and the effect that they would have upon the community at large; noticed the way Crater Lake is considered by the public, and basing his opinion upon his observation in that line in this and other parts of the world, in his belief the benefits to be derived from the contemplated highway would be enjoyed mostly by the State at large; that he and his company constantly receive inquiries from "all parts of the compass, everywhere," as to the easiest and best manner of reaching this park.

Much other testimony of similar import was offered and admitted without objection, in response to which no

evidence was offered by plaintiff; and the facts testified to are not disputed, except in so far as the effect thereof may bear upon the constitutionality of the act presented.

In view of the conceded facts, it would seem the public importance as compared to the local benefits, could hardly admit of doubt. One of the great assets of any commonwealth is its scenery; its freaks of nature, whether in its rugged mountains or its valleys; its lakes, mammoth caves, hot springs, as in Arkansas, or geysers, such as appear in Yellowstone Park, etc. Upon assets of this character many of the railway lines, throughout the various states in which they operate, such as those along the Columbia, the Denver & Rio Grande, and other so-called "scenic" railways, rely for much of their income; and the states in which the natural wonders may be situated proportionately share in the benefits accruing therefrom. As appears from Col. C. E. S. Wood's evidence:

"Both as a highway to a world-famous point of scenic beauty, and as a highway, making a comfortable and easy artery of communication between the eastern and western portions of the State, it will be of general and public benefit to the State of Oregon, much in the same way as the famous highways of Switzerland, opening up the scenic beauties of Switzerland, are profitable to the whole country, and as the national highway, penetrating the Alleghany Mountains, was profitable to the United States, and especially is this true because of the isolation of Eastern Oregon and the absence of all railroad development."

Considering then, the combined advantages to accrue to the State, by uniting and bringing in touch with each other, the two great divisions of the State, as shown, together with the opening to the people of the entire State, by a convenient road, what promises to be one among the great public parks and natural wonders of the continent, can it be legally held that the act in question is void? Holding unconstitutional this act violates, I think, both the letter and spirit of the constitution, and especially

disregards the rule of construction invoked by this court in an unbroken line of decisions for half a century, to the effect that constitutions, in order that the object of the government may be accomplished, must be construed liberally and along broad, general lines; and that, before an act shall, by the courts, be annulled and held for naught, the conflict must appear beyond a reasonable doubt. Does the showing made in this instance eliminate all reasonable doubt as to the validity of the act? I think not. In fact, I can see no room for a substantial doubt upon the subject, and must therefore record my dissent from the conclusion announced by the majority.